BENDIX CORPORATION, A
Delaware Corporation

v.

The UNITED STATES.

No. 78–71.

United States Court of Claims.

March 24, 1982.

John E. Kidd, New York City, for plaintiff; Stanton T. Lawrence, Jr., New York City, attorney of record; Brian M. Poissant, Pennie & Edmonds, New York City, William F. Thornton and William N. Antonio, The Bendix Corp., Southfield, Mich., of counsel.

Steven Kreiss, with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D. C., for defendant; Vito J. DiPietro, Washington, D. C., of counsel.

Before DAVIS, NICHOLS and SMITH, Judges.

### OPINION

PER CURIAM:

This case is before the court for determination of the amount of reasonable and entire compensation due plaintiff, Bendix Corporation, under 28 U.S.C. § 1498, for the government's infringement of the Mock patent. Mock Patent No. 2,581,275 involved a fuel-metering control system which scheduled the flow of fuel to jet aircraft engines in relation to the jet engine speed, air pressure, and temperature of the air flowing to the engine. The 17-year term of the Mock patent commenced on January 1, 1952, and expired on January 1, 1969. 35 U.S.C. § 154.

In *Bendix Corporation v. United States,* 220 Ct.Cl. 507, 540, 600 F.2d 1364, 1384 (1979), we held that claims 4, 5, 7, 11, 12, 13, 14, and 17 of the Mock patent were valid and had been infringed by the manufacture for and use by the government of the 1307 model main fuel control system manufac-

tured by the Woodward Governor Company (Woodward) and later installed by the General Electric Company (G.E.) in the J–79 models of gas turbine jet engines. We also held that the Mock patent had been infringed by the government's use of the MFC model main fuel control system manufactured and installed by G.E. and sold to and used by the government. Because 28 U.S.C. § 1498 permits the government to take a license, through exercise of its eminent domain power, in any United States patent, we concluded that the government had taken a royalty-bearing license in plaintiff's patent. 220 Ct.Cl. at 540, 600 F.2d at 1384. We referred the case to Trial Judge Browne for a determination of the amount of reasonable recovery due plaintiff. Trial Judge Browne reported that plaintiff was entitled to recover $16,106,055, plus delay compensation at the rate of $2,563 per day from February 1, 1980, to the date of payment of the judgment. Both parties have excepted to the opinion, findings of fact, and conclusion of law of the trial judge. We agree with the larger part of Trial Judge Browne's opinion and, accordingly, adopt his opinion with some modification but deleting his discussions on spare MFC parts and sanctions. Mathematical errors have also been corrected.*

In places in Trial Judge Browne's opinion occurred the thought that, according to recent holdings of this court, the government is allowed to infringe at a cheaper rate than a private infringer would be. In his view, a private infringer would be assessed 10 percent of the royalty base in the circumstances here involved, while government, therefore, would be liable for only 7½ percent, citing *Decca Ltd. v. United States,* 225 Ct.Cl. 89, 640 F.2d 1156 (1980), *cert. denied,* —— U.S. ——, 102 S.Ct. 99, 70 L.Ed.2d 89 (1981). *Decca* holds that the United States Government is not liable under 28 U.S.C. § 1498 for inducing infringement by others, or for contributory in-

---

* Our separate order of this date adopts the trial judge's findings (with specified changes). We do not print the findings because this opinion gives the facts necessary for an understanding of our decision. Any facts stated in this opinion, but not contained in the former findings, are to be considered additional findings of fact.

fringement. Moreover, *Leesona Corp. v. United States*, 220 Ct.Cl. 234, 599 F.2d 958, *cert. denied*, 444 U.S. 991, 100 S.Ct. 522, 62 L.Ed.2d 420 (1979) holds that the punitive elements that often appear in private patent awards are not proper under § 1498, because, unlike the private infringer, the United States in a § 1498 case is doing what it has a right to do. Insofar, however, as the awards against the private infringer, and against the government taker, both would apply to the same unauthorized, unlicensed uses of a patented invention, and are both *nonpunitive*, and both undertake only to assess reasonable and entire compensation for the interest taken or infringed, the results ought to be similar, just as the awards in many land taking cases would have been no more or less if they had been trespass cases. We do not determine there would have been adequate grounds for mulcting anyone at 10 percent, whoever it was. The trial judge adduces reasons which we adopt for finding 7½ percent to be reasonable and entire compensation in this case, and we do not pass on cases not before us. We have, therefore, eliminated intimations that the award would be higher if defendant were not the government. It might be, but it would depend on other differences in the cases, and would not be automatic.

## OPINION OF TRIAL JUDGE

BROWNE, Trial Judge:

### I. *Period of Recovery*

Bendix at first sought recovery from defendant for its unauthorized use of the invention covered by the Mock patent by filing an administrative claim with the Department of the Air Force on March 15, 1958. This claim was ultimately and finally denied on April 29, 1970. The petition in this court was filed less than a year thereafter on March 5, 1971.

---

1. There is an implicit bar to recovery for infringements if a petition is filed against a private party more than 6 years after a patent expires, as will be seen from the discussion which follows.

Actions against the United States are normally barred by statute unless the complaint or petition is filed within 6 years after the right of action or claim *first* accrues. 28 U.S.C. §§ 2401, 2501. The court has held, however, that where there are incremental takings of *ad hoc* licenses under patents by exercise of the power of eminent domain, the statute of limitations does not bar an action with respect to any takings which occurred within 6 years of the date of filing the petition in this court.

In *Irving Air Chute v. United States*, 117 Ct.Cl. 799, 93 F.Supp. 633 (1950), the government's contention that the 6-year statute of limitations prescribed by 28 U.S.C. § 2501 (and, by inference, also as provided in 28 U.S.C. § 2401) begins with the *first* incremental taking of a patent license by eminent domain was unequivocally rejected by the court. The court arrived at a "rational solution" to the problem peculiar to the incremental taking of *ad hoc* licenses under patents by eminent domain. It held that each delivery which occurred within the 6-year period preceding the filing of the petition was a compensable taking, but those which occurred earlier were not. In reaching this solution, the court pointed out that in actions against private infringers under Title 35, United States Code, there is no statute of limitations which limits the time within which an action must be filed but that recovery by a patent owner is limited by 35 U.S.C. § 286 to infringements which occurred within the 6-year period prior to the date of filing the complaint. The statute thus merely placed a limitation on the *period of recovery* of damages, not on the time for bringing the action [1] against a private infringer.

In the case of claims against the United States for unauthorized use of a patented invention, however, the *period of recovery* is expressly extended by the second sentence of 35 U.S.C. § 286.[2] It

---

2. "35 U.S.C. § 286. Time limitation on damages.

"Except as otherwise provided by law, no recovery shall be had for any infringement committed more than six years prior to the

provides that up to 6 years of the period between the date of receipt of a claim by a government department having authority to settle the claim and the date of mailing to the claimant of a notice of denial by that government department *shall not be counted* as part of the 6-year period to which recovery of damages would otherwise be limited under the first sentence of that section. Thus it is mathematically possible for the period of recovery to extend over a total maximum of 12 years.

Had Bendix not filed an administrative claim, the *period of recovery* would have been limited to deliveries made from March 5, 1965, to January 1, 1969 (the date of expiration of the Mock patent), but the action would not have been *barred* by 28 U.S.C. §§ 2401 or 2501, nor by 35 U.S.C. § 286 with respect to deliveries earlier than March 5, 1965.

The administrative claim was pending for a total period of 12 years 1 month 14 days (March 15, 1958, to April 29, 1970). Since 35 U.S.C. § 286 (second sentence) provides that a maximum of 6 years may be added to the normal 6-year period of recovery, allowed in the first sentence of that section, the earliest date for which recovery may be had is March 5, 1959.

Defendant would have the court indulge in an exercise in semantics whereby the second sentence of 35 U.S.C. § 286 would be interpreted as a statutory *bar* rather than to mean that up to 6 years (of the 12 years 1 month 14 days during which the Department of the Air Force had the administrative claim under consideration) would be tacked on to (and not counted as part of) the 6 years prior to the date of filing the present action. Defendant takes

the words "up to six years" appearing in the second sentence of 35 U.S.C. § 286 to mean that, no matter when the administrative claim was filed or how long the Air Force kept it under advisement, only the first 6 years of pendency of the claim may be excluded, and since that period did not overlap the 6-year period prior to bringing suit, Bendix may not carry its recovery date back more than a total of 6 years prior to the date the petition was filed in the Court of Claims.[3]

Reference is made to the chart attached hereto as Appendix A. From the chart it is readily recognized that defendant's interpretation of 28 U.S.C. § 2501 in light of 35 U.S.C. § 286 would render the second sentence of 35 U.S.C. § 286 a nullity.

The patent issued on January 1, 1952 (Line I, Heading 1) and expired after 17 years on January 1, 1969 (Line I, Heading 7). Bendix filed its administrative claim on March 15, 1958 (Line II, Heading 2), while the patent was still in force. The administrative claim was pending for 12 years 1 month 14 days when it was finally denied on April 29, 1970 (1 year 3 months 29 days after the patent had expired). (Line II, Heading 8). The petition was filed in this court on March 5, 1971, less than one year after the administrative claim was denied. (Line III, Heading 9). The statute of limitations prescribed by 28 U.S.C. §§ 2401, 2501 measures back 6 years from the date of filing the petition in this court on March 5, 1971 (Line IV, Heading 9) to March 5, 1965 (Line IV, Heading 6). Since the patent expired January 1, 1969 (Line I, Heading 7), there could be no recovery under any circumstances after that date. Hence the *maximum* period of recovery under the *first* sentence of 35 U.S.C. § 286 would be from

filing of the complaint or counterclaim for infringement in the action.

"In the case of claims against the United States Government for use of a patented invention, the period before bringing suit, up to six years, between the date of receipt of a written claim for compensation by the department or agency of the Government having authority to settle such claim, and the date of mailing by the Government of a notice to the claimant that his claim has been

denied shall not be counted as part of the period referred to in the preceding paragraph."

3. There have been cases in which the court denied application of the last sentence of 35 U.S.C. § 286 *retroactively* from the date of *enactment* of that section, but those cases are inapposite here since all use of the invention by defendant was subsequent to the effective date of the present statute.

March 5, 1965 (Line V, Heading 6) to January 1, 1969 (Line V, Heading 7). This is a period of 3 years 9 months 4 days, all of which period is included in and coincides with the 12+ year-period of pendency of the administrative claim.

Line VI shows how Bendix applies the *second* sentence of 35 U.S.C. § 286 by tacking "up to six years" of the time during which the administrative claim was pending (See Line II, Headings 2 to 8) to the 6-year period prior to filing the petition (Line IV, Headings 6 to 9), thus moving the recovery period back to March 5, 1959 (Line VI, Heading 3). This would not carry the date back as far as the date of filing of the administrative claim (Line II, Heading 2) or the date of issuance of the patent (Line I, Heading 1), but it would, however, give Bendix the benefit of "up to 6 years" of the 12+ years the administrative claim was pending, in addition to the 6-year "period before bringing suit" in this court.

Defendant would, as indicated on Line VII, confine the period of recovery to the 3 year 9 month 4 day-period from March 5, 1965 (Line VII, Heading 6) to January 1, 1969 (Line VII, Heading 7), thus giving Bendix no benefit whatever of the enlargement of the recovery period provided by the *second* sentence of 35 U.S.C. § 286. Defendant suggests that the words "up to six years" means that only the *first* 6 years of pendency of the administrative claim (Line VII, Heading 2 to Line VII, Heading 4) is allowed and such period cannot be tacked on to the 3+ year-period (Line V) unless it *overlaps* the 6-year "period before bringing suit" (Line IV).

The present issue turns on interpretation of the words "the period before bringing suit, up to six years" and the words "shall not be counted" in light of the legislative intent of the recovery extension provision of 35 U.S.C. § 286.

P. J. Federico, in his "Commentary on the New Patent Act," 35 U.S.C.A. § 1, p. 56, states that the last sentence of the recovery statute " * * * extends the period of limitations with respect to suits against the Government in the Court of Claims by *not counting* time that administrative settlement proceedings were pending *as part of the six years.*" (Emphasis supplied.) If Bendix had filed its petition in the Court of Claims the day after the administrative claim was finally denied, the period of recovery would have been extended back for the maximum of 12 years "before bringing suit" (except for the period following expiration of the patent). If, on the other hand, Bendix had filed its petition during pendency of the administrative claim and before the patent expired, the full 12-year maximum period of recovery would have been allowed.

Construing the two sentences of the statute together, recovery is limited to a date no earlier than 12 years prior to the filing of the petition, no matter what other conditions exist. On the facts in this case, Bendix is entitled to recovery only back to March 5, 1959. (Line VI.)

## II. *Compensation Base*

The J–79 and J–85 engines delivered to defendant by G.E. were equipped with the 1307 and the MFC fuel controls, respectively. Some additional 1307 fuel controls and MFC fuel controls, however, were purchased by defendant either directly from Woodward or from G.E. The annual unit deliveries of *all* 1307 and MFC fuel controls to defendant for the period from March 5, 1959, to December 31, 1968, whether installed in engines or procured separately, are shown in Appendix B. The entire market value of the fuel control systems, as installed in the respective engines, is used as the compensation base in this case.

## III. *Compensation Base and Rate*

Bendix asks that a compensation rate of 10 percent of the cost to the government of the 1307 and MFC fuel control systems, as installed in the J–79 and J–85 engines and delivered to defendant ready for use, be used in computing the amount of reasonable and entire compensation under 28 U.S.C. § 1498(a). In support of its argument that 10 percent is a reasonable rate, Bendix points out that, based on the total *engine* cost of approximately $1.84 billion,

the percentage would be a mere 0.56 percent. Since the fuel control systems installed in the J–79 and J–85 engines by G.E. were procured by G.E. from Woodward as its sole source, it was possible to ascertain what part of the engine price was attributable to the fuel control system. Therefore, the market value or cost of the fuel control systems to the government, as installed in the engines, is more nearly related to the value of the Mock invention than the market value of the engines in which they were installed or the fuel control without the necessary accessories to make it operate to control fuel flow to the engine. The fuel controls had to be adapted to the specific engines and there was no uniform price for the entire fuel control system from one contract to the next or from one type of fuel control system to the other.

Bendix cites *Pitcairn v. United States*, 212 Ct.Cl. 168, 547 F.2d 1106 (1976), *cert. denied*, 434 U.S. 1051, 98 S.Ct. 903, 54 L.Ed.2d 804 (1978), as a basis for applying the 10 percent compensation rate to the engine cost. In that case the court considered the fact that the claims were directed to an overall system which embodied a pioneer invention. Just as the blades in which the Pitcairn invention was embodied gave value to the entire aircraft (including the engines in some licenses and excluding the engines in others), the Mock fuel control gave its value at least to the J–79 and J–85 engines (exclusive of the value of the airframes) if not to the entire aircraft. Under the "entire market value" rule, Bendix's argument is not without merit. The engines procured by the government cannot function without a fuel control system, but the aircraft can fly with other engines. The fuel control system must be connected to the fuel nozzles in the compressor of the jet engine and the sensing devices which monitor the system must be connected to the compressor inlet (to detect compressor inlet pressure), to the compressor discharge (to detect compressor discharge pressure) and to the exhaust (to detect exhaust gas temperature) whereby the speed/density concept of the Mock invention may be utilized. Just as the scopes required plug-ins

in *Tektronix, Inc. v. United States*, 213 Ct.Cl. 307, 308, 557 F.2d 265, 266 (1977), and the rotary wings required a fuselage in *Pitcairn*, the Mock fuel control requires connection to and installation in the J–79 and J–85 engines. Since the Mock invention relates to a fuel control *system*, the rate should be based on the entire market value of either the engine or of the complete fuel control system *as installed* in an engine (and as delivered to the government ready for use), not discounted with respect to unpatented but, nonetheless indispensable connecting hardware.

Spare 1307 and MFC fuel controls purchased by the government from either Woodward or G.E. are to be included in the compensation base. The number of spare 1307 fuel controls directly procured by the government from Woodward has been stipulated by the parties as 187. The number of spare MFC fuel controls procured by the government from G.E. has not been so stipulated. Defendant does not dispute that spare MFC fuel controls were, in fact, so procured, but argues that because the number of spare MFC fuel controls procured cannot be determined with certainty, the compensation base cannot be increased to accommodate a speculative and unproven amount of spare MFC fuel controls. In support of its argument, defendant cites us to *Marconi Wireless Telegraph Co. v. United States*, 99 Ct.Cl. 1 (1942), *modified on other grounds*, 320 U.S. 1, 63 S.Ct. 1393, 87 L.Ed. 1731 (1943) and *Leesona Corp. v. United States, supra.*

Both cases are inapposite to the narrow issue before us. In *Marconi Wireless Telegraph Co., supra*, and *Leesona Corp., supra*, the spare parts issues involved determinations of whether the primary purpose of the spare parts was for "repair" or "replacement" of unpatented components of the patented invention, or "reconstruction" of the patented item. If for the former, the spare parts were not to be included in the compensation base. If for the latter, the spare parts were to be included. In *Marconi Wireless Telegraph Co., supra*, because no evidence was established that would al-

low us to allocate spare parts with reference to repair or reconstruction and, further, because testimonial evidence established that at least some of the spare parts were to be used for repair, the cost of the spare parts were, accordingly, omitted from the compensation base. 99 Ct.Cl. at 56.

In the instant case, we do not need to allocate between repair and reconstruction. The spare parts are not unpatented components of a patented invention but are, themselves, the patented invention. Therefore, the cost of spare MFC and 1307 fuel controls must be included in the compensation base.

In establishing the amount of spare MFC fuel controls procured, plaintiff would have us determine that 10–12 percent of the total procurement of MFC fuel controls installed in J–85 engines would be a reasonable amount of spare MFC fuel controls. Plaintiff obtains this figure by relying on its testimonial and documentary evidence introduced at trial. This figure appears too high and we choose not to adopt it. Instead, a better indication of the probable amount of spare MFC fuel controls procured can be obtained by examining the spare 1307 fuel control figures. The 187 spare 1307 fuel controls represents 1.65 percent of the total procurement of 1307 fuel controls installed in J–79 engines. This 1.65 percent is a reasonable percentage upon which to base our calculations. Accordingly, the number of spare MFC fuel controls will also be set at 1.65 percent of MFC fuel controls installed in J–85 engines procured or 82.

Using the entire market value of the fuel control system as installed, the compensation base in this case amounts to $104,301,-603. (See Appendix C for computation.)

Normally the larger the compensation base, the lower the compensation rate, and *vice versa.* Here, where the total engine cost of more than 16,000 engines is $1.84 billion (and the complete aircraft cost runs into multibillions of dollars), application of a 0.56 percent compensation rate to the engine price as the base would yield approximately $100 million. Since the fuel control system constitutes only about 5 percent of the engine price, by applying a 10 percent rate to a total fuel control system cost of approximately $100 million, the recovery would be approximately $10 million. Using either combination of compensation base and rate, it must be determined whether recovery of an amount in the order of $10 million would be excessive.

It is evident that the entire market value of the invention may be readily expressed in terms of the value of the fuel control system, as a whole as installed in the J–79 and J–85 engines. Whereas a 10 percent compensation rate based on the entire market value of the fuel controls systems would not necessarily constitute an excessive recovery, a rational basis must be found for the rate to be applied in arriving at the compensation to which Bendix is entitled for the eminent domain taking of a license under the Mock patent by the government.

The court in *Decca Ltd. v. United States, supra,* rejected a "savings to the Government" basis for recovery in favor of a "reasonable royalty" basis because Decca had granted two commercial licenses under which the rights granted were "similar to the rights [under the Decca patent] taken by the Government." The previously issued licenses were considered by the court to be a means for determining "a more conventional and substantiated measure of the liability legally incurred by defendant." The court then made its own determination of "a reasonable royalty base and a reasonable royalty rate."

Bendix has not granted any rights under the Mock patent which are truly "similar to the rights thereunder taken by the Government." It has not issued any unilateral domestic licenses under the Mock patent. Bendix wishes to use its domestic patent rights as a means of obtaining its fair share of the domestic market for the products to which its patents pertained, rather than license its competitors. It willingly granted licenses under foreign counterparts of the Mock patent (together with other fuel control patents in its portfolio) since Bendix was not in the business of manufacturing in

the foreign countries. Those licenses provided that Bendix would not only allow the licensees to manufacture fuel controls under its patents but would also furnish its know-how and technical assistance to enable the licensees to embody the licensed inventions in marketable products. The royalty rate stated in those licenses was 7.5 percent based on the selling price of the licensed product. If only the know-how and technical assistance was used on a given product, the royalty rate on that product would, nevertheless, be 5 percent. There were no licenses issued under one or more Bendix patents without inclusion of the know-how and technical assistance provisions.

In the present case, the government had already procured some Bendix fuel control systems from Bendix and Bendix collaborated with General Electric in an effort to adapt the Mock control to the J–79 and J–85 engines and their prototypes. Thus Bendix had already made available much of its know-how and technical assistance before Bendix lost out to Woodward on the fuel control system requirements for the J–79 and J–85 engines to be built by G.E. There is no evidence that the government furnished any engineering assistance, technical data, or know-how.

Domestically, Bendix and United Aircraft (United) entered into a cross-licensing agreement under which Bendix received a license under United's "Best" patent and United was granted a conditional license under the Mock patent. This agreement was entered into primarily for the benefit of United's subsidiary, Hamilton-Standard, which was a dominant figure in the propeller and propeller control field before jet engines came into prominence. Seeing the "handwriting on the wall," Hamilton-Standard began to diversify into the field closest to its propeller business interests in aircraft propulsion, namely, fuel control systems for the jet-prop and pure jet engines. Bendix was already the largest producer of carburetion systems for piston-type internal combustion engines and was at the forefront of development of jet engine fuel control systems for jet-prop and jet engines. In short, Hamilton-Standard was headed into competition with the established leader in the aircraft engine fuel control field. It appeared that Hamilton-Standard had a captive market in its sister-subsidiary of United, namely, the Pratt and Whitney (P&W) engine division of United. Since P&W (through United) was a customer of Bendix, not only for fuel controls but also for ignition systems, the prospects of loss of business and possible confrontation in patent litigation caused Bendix to make an exception to its normal policy of refraining from licensing a domestic competitor (and customer). Bendix wanted a license under the Best patent and United wanted a license under the Mock patent. They both wanted to avoid litigation. Therefore, they entered into a license agreement which accommodated both parties. There was no similar agreement in which Bendix included a license under the Mock patent.

The agreement under which Bendix and United settled their differences provided that if United procured from Bendix a total of $20 million worth of fuel controls from Bendix over a period of 10 years, United would not owe Bendix any cash royalty under the licensed patents. Bendix obviously expected to obtain full compensation for use of the invention by including the value of the invention in the selling price of the fuel control systems. To the extent that United failed to buy $20 million worth of fuel controls from Bendix, the agreement provided that United would pay Bendix 4 percent of the difference between $20 million and the dollar value of fuel controls actually purchased from Bendix. Thus, if United had bought *no* fuel controls from Bendix, its maximum liability would be $800,000. As it was, United bought more than $20 million worth of controls from Bendix in much less than 10 years and Bendix received no cash royalty from United. On the other hand, Bendix not only received a royalty-free license under the Best patent (the precise value of which was

not stated), but was also assured of a contract for ignition systems required by United. Both the Best patent and the Mock patents were, however, extremely valuable in the fuel control art, without regard to the business considerations which were reflected in the agreement. Since there were cross-licenses under the two patents, the dollar amounts or royalty percentages expressed in the agreement are of very little significance in arriving at the value of a unilateral license under either patent.

After the agreement between Bendix and United was consummated, Bendix approached G.E. in the hope that Bendix would either provide G.E.'s requirements for fuel control systems or that G.E. would take a license under the Mock patent for itself and on behalf of its supplier of fuel controls. G.E. referred Bendix to Woodward, since G.E. did not plan to manufacture the fuel control systems for the J–79 or J–85 engines, but intended to procure them from Woodward.

Upon approaching Woodward, Bendix was turned down flatly. At trial it was established that while Woodward takes out patents on its own inventions, it neither takes patent licenses from or grants patent licenses to others. Since G.E. would not split its procurement of fuel controls between Woodward and Bendix and neither G.E. nor Woodward would take a license from Bendix, both proceeded with infringement of the Mock patent on the assumption that liability for such infringement, if any, would be borne by the government under 28 U.S.C. § 1498(a).

Meanwhile, Bendix was involved in an interference proceeding in the United States Patent Office with one of its principal competitors in the carburetion field, namely, Holley. The interference was settled by an agreement whereby the issue of priority of invention was to be determined on the basis of a stipulated record and, the

prevailing party to grant a license to the losing party. The royalty rate was to be 2 percent of the selling price of the products sold under the license. At the time Holley's financial situation was precarious and a higher royalty rate would have been impractical. Therefore, Bendix settled for a lower-than-normal royalty rate, thereby benefitting both parties.

Neither the United license nor the Holley license under the Mock patent can be said to be "similar to the rights [under the Mock patent] taken by the Government," since the government took a unilateral license and gave nothing in return. Indeed, the net effect was to damage Bendix's competitive position in the fuel control business. There was no "market" for domestic licenses under the Mock patent, since there was no "willing buyer-willing seller" in the industry. The patent was licensed by Bendix to United and Holley only under duress or threat of loss of business or patent rights and those rights were ultimately flaunted by the government, G.E., and Woodward.

■ Bendix's plea for a 10 percent compensation rate is, indeed, reasonable if loss of profit is any criterion of reasonableness. The loss of profits test, however, has been looked upon with disfavor by this court in recent cases in the absence of a compelling showing that the patent owner would have been capable of supplying the government's requirement and would have not only received the contract but also would have retained the profit claimed.[4]

The choice of a reasonable compensation rate, therefore, boils down to a range of from 15 percent (lost reasonable profit), down to 2 percent (the Holley bilateral, mutual accommodation license). Between those ranges there are the foreign licenses at 7.5 percent (with a reduction to 5 percent if no patents are applicable to the sales), and the United license at 4 percent (condi-

---

4. *Tektronix, Inc. v. United States*, 213 Ct.Cl. 257, 552 F.2d 343 (1977); *Leesona v. United* *States, supra.*

tioned on purchase of a specific dollar amount of fuel controls within a specified period of time and other business considerations). If the Mock invention was but a minor improvement on other inventions in a relatively simple art, the lower end of the range could readily be applied. Since the Mock invention, however, dominated the sophisticated aircraft jet engine fuel control art, it should be valued at or above the middle of the range. Taking into account the development costs and business risks borne by Bendix, a better-than-average rate would be justified.

It is concluded that the 7.5 percent rate under which the Mock fuel controls could have been manufactured in foreign countries is a reasonable rate. Bendix could afford to lower the rate to 7.5 percent in those cases since the foreign licensees would not be competing with Bendix for business in the United States or *vice versa*. Those are the only licenses which were entered into in arm's-length negotiations without the licensees being in a position to extract concessions from Bendix and from whom Bendix received favorable business considerations. This rate, moreover, is consistent with the 7.5 percent patent license royalty rate adopted by the court in *Decca, supra*, based on the license under which Bendix was Decca's licensee.[5]

When a basic compensation rate of 7.5 percent is applied to the entire market value of the fuel control systems procured and used by the government in the present case, the recovery amounts to $7,822,620. (See Appendix D for computation.)

IV. *Delay Compensation Periods and Rates*

■ Bendix is entitled to delay compensation in addition to the amount of recovery to which Bendix is entitled for each procurement of J–79 and J–85 engines equipped with 1307 or MFC fuel controls

and for the fuel controls procured directly from Woodward and G.E. The Bendix foreign licenses under which the 7.5 percent compensation rate is based called for payment within 90 days of the close of each calendar quarter in which the obligation to pay royalties accrued. In the present case, Bendix is willing to accept computation of delay compensation for the 1307 fuel controls on the basis of the compensation becoming due on the last day of each calendar year in which engine deliveries were made to the government. Thus, for engines delivered in 1959, delay compensation became due December 31, 1959, and computation thereof commenced on January 1, 1960. With respect to the MFC fuel controls weighted delivery dates have been agreed to for the deliveries made to the government between March 5, 1959, and June 30, 1965, and between July 1, 1965, and December 31, 1968. Those respective weighted dates are May 1, 1962, and April 1, 1967, respectively.

In addition to determining the period for which delay compensation is to be computed, the rate of delay compensation must be determined. For the quinquennial periods preceding 1975, the court has established the rates in *Tektronix, Inc. v. United States*, 213 Ct.Cl. at 274, 552 F.2d at 352. For the quinquennial periods subsequent to 1975, different rates may be applied, but only where "it is affirmatively demonstrated that under the theory of the *Pitcairn* opinion the rate for the years after 1975 should differ from the 7½% rate set for 1971–1975." *Id. Tektronix, Inc. v. United States*, 216 Ct.Cl. 144, 151, 575 F.2d 832, 836, *cert. denied*, 439 U.S. 1048, 99 S.Ct. 724, 58 L.Ed.2d 707 (1978). *See also Georgia Pacific Corp. v. United States*, 226 Ct.Cl. ——, ——, 640 F.2d 328, 366–67 (1980).

In this case Bendix, quite appropriately, affirmatively demonstrated that a rate higher than 7.5 percent should apply after

---

5. It is recognized that the license to Bendix in *Decca, supra*, was in the field of navigation electronics, whereas here we are dealing with the field of jet propulsion. Nevertheless, both are in highly sophisticated arts, practiced on a worldwide basis and involving not just millions, but billions of dollars worth of procurement.

1975, by relying on the interest rate applied where excess profits are determined and interest is computed on the recovery under 50 U.S.C. app. § 1215(b)(2). Renegotiation Act of 1951. For the 5-year period from January 1, 1976, to January 31, 1980, the average rate was 8.5 percent per annum. From February 1, 1980, to the date of payment of the judgment, Bendix has affirmatively demonstrated that a rate of 12 percent is applicable since that is the rate computed under the terms of 26 U.S.C. § 6621(b) for interest on taxes due from taxpayers (or recovered in actions by taxpayers in the Court of Claims) under the Internal Revenue Act of 1978, *as amended.*

Bendix is entitled to delay compensation in the amount of $8,439,375 to January 31, 1980, plus further delay compensation at the rate of $2,572 per day from February 1, 1980, to the date of payment of the judgment. (See Appendices E–1 and E–2 for computations.)

### V. *Sanctions*

Trial Judge Browne assessed damages against defendant in the amount of $534 as sanctions for the government's refusal to specifically comply with his pretrial order. In its brief, defendant vehemently contested such action by the trial judge. At oral argument, plaintiff expressly waived any right to the $534 awarded to it as sanctions. Therefore, we need not rule on the propriety of Trial Judge Browne's actions in this matter. The $534 awarded as sanctions is accordingly excluded from plaintiff's total recovery.

### VII. *Summary*

■ Determination of the amount of reasonable and entire compensation to which a successful plaintiff is entitled under 28 U.S.C. § 1498(a) is, in the final analysis, a matter of subjective judgment. There is no set formula or equation to fit all circumstances. That subjective judgment, however, has been narrowed down by precedents of this court to consideration of only the base to be used (the dollar amount thereof) and the rate (percentage) to be applied to that base. Where the patent owner has granted one or more comparable, unilateral, arm's-length licenses under the patent in suit, the rate is constructively established.

The base in the present case, most logically, is the cost to the government of the entire fuel control system, as installed in and included in the price of the J–79 and J–85 jet engines delivered to the government, ready for use. The cost of the fuel control systems to the government (approximately $6,000 to $7,000 each) is only about 5 percent of the cost of the engines in which they are installed. Since the essential elements of the fuel control system are separately procured by the engine manufacturer (and are, therefore, subject to separate pricing in post-contract audits) and the fuel control systems must be installed in the engines ready for *use* by the government, it is the purchase price *paid by the government* for the fuel control systems, *as installed*, which is the measure of the value of the invention *used* by the government.[6]

The rate having been constructively established at different percentages in different licenses granted by Bendix in exchange for different considerations, one must choose for this case the rate which is most nearly applicable to the considerations flow-

---

**6.** 35 U.S.C. § 271 provides that anyone who "makes, *uses* or sells any patented invention" without authority is an infringer. 28 U.S.C. § 1498(a) provides that the patent owner may recover from the government whenever his patented invention is "*used* or manufactured *by* or for the United States" without a license. (Emphasis supplied.) It is the *use* of the invention for which the patent owner must be compensated in the present case, since the fuel control systems were not *manufactured* by or for the government (except those purchased directly from Woodward as spares), but were furnished to the government ready for *use* as an indispensable component of the delivered engines. Since savings to the government is not an applicable measure of value of the invention, application of the compensation rate to the cost of the hardware to the government is a suitable, although only approximate, base for computation of the amount to which Bendix is entitled as reasonable and entire compensation.

ing between the patent owner (Bendix) and the government.

The government held no patents or applications which constituted a threat to Bendix's right to make fuel controls. The government was not in a position to guarantee that it would buy any specific number of fuel controls from Bendix since the government must award its contracts to the lowest bidder, regardless of patent considerations. The government was not a competitor in the fuel control business but was in a position to put others into competition with Bendix. The government was not the owner of any patent applications in interference with any patent applications owned by Bendix. In brief, the government was in the same position as Woodward (a private infringer except for the applicability of 28 U.S.C. § 1498(a)) in refusing, under any circumstances, to take a unilateral license under the Mock patent. If Woodward had taken a unilateral license as a result of bona fide arm's-length negotiations with Bendix, the rate established by such a license could have been absorbed in the 15 percent allowable profit and the license would then have been entitled to great weight in determining the fair market value of a license under the patent. The government, however, obtained a license under the eminent domain theory and gave no consideration in return. That being the case, the foreign licenses under the Mock patent are most analogous since the licensees in those cases were not obligated to provide any consideration other than payment of money in fulfillment of their obligations under the licenses.

### VIII. *Conclusion*

Computation of the basic compensation at a 7.5 percent rate is set forth in Appendix D. Application of the respective quinquennial delay compensation rates to the basic compensation for the respective periods involved is set forth in Appendices E–1 and E–2. The total recovery to which Bendix is entitled is summarized in Appendix F.

Applying a 7.5 percent rate to the base of $104,301,603 (Appendix C), Bendix is entitled to recover $7,822,620, plus delay compensation in the amount of $6,070,507 for the 1307 model fuel control systems and $2,368,868 for the MFC fuel control systems, for a total judgment of $16,261,995, with additional delay compensation to be paid by defendant at the rate of $2,572 per day from February 1, 1980, to the date of payment of the judgment. Judgment is entered accordingly.

### CONCLUSION OF LAW

Upon the findings and foregoing opinion, which are adopted by the court, the court concludes as a matter of law that plaintiff is entitled to recover sixteen million two hundred sixty-one thousand nine hundred and ninety-five dollars ($16,261,995), plus delay compensation at the rate of two thousand five hundred seventy-two dollars ($2,572) per day from February 1, 1980, to the date of payment of the judgment, and judgment is entered for plaintiff in that amount.

APPENDIX A - PERIOD OF RECOVERY

FUEL CONTROLS

## APPENDIX B
### QUANTITY

| | 1307 Fuel Controls GE–J–79 | 1307 Fuel Controls Woodward | MFC Fuel Controls GE–J–85 | MFC Fuel Controls GE–J–85 (Spares) | Total |
|---|---|---|---|---|---|
| 1959 | 511 | | | | 511 |
| 1960 | 796 | | | | 796 |
| 1961 | 925 | | | | 925 |
| 1962 | 1,307 | | | | 1,307 |
| 1963 | 974 | | | | 974 |
| 1964 | 1,312 | | | | 1,312 |
| 1965 | 1,152 | 24 | 2,107* | 33*** | 3,226 |
| 1966 | 1,510 | 68 | | | 1,578 |
| 1967 | 1,583 | 95 | | | 1,678 |
| 1968 | 1,333 | | 2,960** | 49*** | 4,342 |
| Total | 11,403 | 187 | 4,977 | 82 | 16,649 |

\* Covers stipulated weighted average delivery period from March 5, 1959, to June 30, 1965.

\*\* Covers stipulated weighted average delivery period from July 1, 1965, to December 31, 1968.

\*\*\* Represents 1.65 percent of MFC fuel controls installed in J 85 engines.

## APPENDIX C

### ENTIRE MARKET VALUE

| | 1307 Fuel Controls Installed in GE J–79 | 1307 Fuel Controls Direct from Woodward | MFC Fuel Controls Installed in GE J–85 | MFC Fuel Controls (Spares) Installed in GE J–85 | Total |
|---|---|---|---|---|---|
| 1959 | $ 5,044,592 | | | | $ 5,044,592 |
| 1960 | 4,662,172 | | | | 4,662,172 |
| 1961 | 4,923,775 | | | | 4,923,775 |
| 1962 | 9,705,782 | | | | 9,705,782 |
| 1963 | 6,274,508 | | | | 6,274,508 |
| 1964 | 8,588,352 | | | | 8,588,352 |
| 1965 | 7,225,344 | $ 123,672 | $ 13,955,623* | $ 139,524*** | 21,444,163 |
| 1966 | 8,905,980 | 331,024 | | | 9,237,004 |
| 1967 | 9,548,656 | 443,840 | | | 9,992,496 |
| 1968 | 9,542,947 | | 14,678,640** | 207,172*** | 24,428,759 |
| Total | $ 74,422,108 | $ 898,536 | $ 28,634,263 | $ 346,696 | $ 104,301,603 |

\* Covers weighted average delivery period from March 5, 1959, to June 30, 1965.

\*\* Covers weighted average delivery period from July 1, 1965, to December 31, 1968.

\*\*\* Represents 73.5 percent of the average cost of MFC fuel control systems ($5,753) installed in J 85 engines, multiplied by number of MFC spares.

## APPENDIX D

### BASIC COMPENSATION
(7.5% Rate)

| | 1307 Fuel Controls Installed in GE J–79 | 1307 Fuel Controls Direct from Woodward | MFC Fuel Controls Installed in GE J–85 | MFC Fuel Controls (Spares) Installed in GE J–85 | Total |
|---|---|---|---|---|---|
| 1959 | $ 378,344.40 | | | | $ 378,344.40 |
| 1960 | 349,662.90 | | | | 349,662.90 |
| 1961 | 369,283.10 | | | | 369,283.10 |
| 1962 | 727,933.60 | | $ 1,046,671.70* | $ 10,464.30 | 1,785,069.60 |
| 1963 | 470,588.10 | | | | 470,588.10 |
| 1964 | 644,126.40 | | | | 644,126.40 |
| 1965 | 541,900.80 | $ 9,275.40 | | | 551,176.20 |
| 1966 | 667,948.50 | 24,826.80 | | | 692,775.30 |
| 1967 | 716,149.20 | 33,288.00 | 1,100,898.00** | 15,537.90 | 1,865,873.10 |
| 1968 | 715,721.00 | | | | 715,721.00 |
| Total | $ 5,581,658.00 | $ 67,390.20 | $ 2,147,569.70 | $ 26,002.20 | $ 7,822,619.90 |

\* May 1, 1962, stipulated weighted delivery date for deliveries March 5, 1959, to June 30, 1965.

\*\* April 1, 1967, stipulated weighted delivery date for deliveries July 1, 1965, to December 31, 1968.

## APPENDIX E–1

### DELAY COMPENSATION *
(1307 Systems)

| Period | Basic Comp. | | Delay Rate | | Years | | Amount Due |
|---|---|---|---|---|---|---|---|
| 1960** | $ 378,344 | × | 4.50 | × | 1 | = | $ 17,025.00 |
| 1961–65 | 378,344 | × | 4.75 | × | 5 | = | 89,856.00 |
| 1966–70 | 378,344 | × | 6.50 | × | 5 | = | 122,961.00 |
| 1971–75 | 378,344 | × | 7.50 | × | 5 | = | 141,879.00 |
| 1976–1/31/80 | 378,344 | × | 8.50 | × | 4.08 | = | 131,209.00 |
| | | | | | | | $502,930.00 |

## DELAY COMPENSATION *
### (1307 Systems)

| Period | Basic Comp. | | Delay Rate | | Years | | Amount Due |
|---|---|---|---|---|---|---|---|
| 1961–65 | $ 349,662 | × | 4.75 | × | 5 | = | $ 83,044.00 |
| 1966–70 | 349,662 | × | 6.50 | × | 5 | = | 113,640.00 |
| 1971–75 | 349,662 | × | 7.50 | × | 5 | = | 131,123.00 |
| 1976–1/31/80 | 349,662 | × | 8.50 | × | 4.08 | = | 121,262.00 |
| | | | | | | | $449,069.00 |
| 1962–65 | $ 369,283 | × | 4.75 | × | 4 | = | $ 70,163.00 |
| 1966–70 | 369,283 | × | 6.50 | × | 5 | = | 120,017.00 |
| 1971–75 | 369,283 | × | 7.50 | × | 5 | = | 138,481.00 |
| 1976–1/31/80 | 369,283 | × | 8.50 | × | 4.08 | = | 128,067.00 |
| | | | | | | | $456,728.00 |
| 1963–65 | $ 727,933 | × | 4.75 | × | 3 | = | $103,730.00 |
| 1966–70 | 727,933 | × | 6.50 | × | 5 | = | 236,578.00 |
| 1971–75 | 727,933 | × | 7.50 | × | 5 | = | 272,975.00 |
| 1976–1/31/80 | 727,933 | × | 8.50 | × | 4.08 | = | 252,447.00 |
| | | | | | | | $865,730.00 |

* In all calculations of delay compensation, amounts are rounded off to the nearest dollar figures, where appropriate.

** No delay compensation is due in 1959 for deliveries made during that year. It is only at the end of the calendar year 1960 that delay compensation (at the 4.5 percent rate) is due for the 1959 deliveries amounting to $378,344. The 4.75 percent rate for the 1961 65 quinquennium thus is applicable in 1961 to 1965 to deliveries made as of the end of the respective calendar years 1960 to 1964. The 6.5 percent rate for the 1966–70 quinquennium is applicable in 1966 to 1970 to deliveries made as of the end of the respective calendar years 1965–69. The 7.5 percent rate for the 1971 75 quinquennium is applicable in 1971 to 1975 to the cumulative compensation due as of the end of the respective calendar years 1970 to 1974. The 8.5 percent rate for the 1976–80 quinquennium, in like manner, is applicable in 1976 to January 31, 1980, to the cumulative compensation due as of the end of the respective calendar years 1975 to 1979. (It will be noted that there were no increments to the basic compensation due after the end of 1968, since the patent expired at the end of that year. Deliveries made in 1968, however, are included in the amount which is subject to delay compensation for the calendar year 1969 (at the 6.5 percent rate). From 1969 on, the amount of basic compensation upon which delay compensation is computed remains the same.)

## APPENDIX E-1

| Period | Basic Comp. | | Delay Rate | | Years | | Amount Due |
|---|---|---|---|---|---|---|---|
| 1964–65 | $ 470,588 | × | 4.75 | × | 2 | = | $ 44,706.00 |
| 1966–70 | 470,588 | × | 6.50 | × | 5 | = | 152,941.00 |
| 1971–75 | 470,588 | × | 7.50 | × | 5 | = | 176,470.00 |
| 1976–1/31/80 | 470,588 | × | 8.50 | × | 4.08 | = | 163,199.00 |
| | | | | | | | $ 537,316.00 |
| 1965– | $ 644,126 | × | 4.75 | × | 1 | = | $ 30,596.00 |
| 1966–70 | 644,126 | × | 6.50 | × | 5 | = | 209,341.00 |
| 1971–75 | 644,126 | × | 7.50 | × | 5 | = | 241,547.00 |
| 1976–1/31/80 | 644,126 | × | 8.50 | × | 4.08 | = | 223,382.00 |
| | | | | | | | $ 704,866.00 |
| 1966–70 | $ 551,176* | × | 6.50 | × | 5 | = | $ 179,132.00 |
| 1971–75 | 551,176* | × | 7.50 | × | 5 | = | 206,691.00 |
| 1976–1/31/80 | 551,176* | × | 8.50 | × | 4.08 | = | 191,147.00 |
| | | | | | | | $ 576,970.00 |

| Period | Basic Comp. | | Delay Rate | | Years | | Amount Due |
|---|---|---|---|---|---|---|---|
| 1967–70 | $ 692,775* | × | 6.50 | × | 4 | = | $ 180,121.00 |
| 1971–75 | 692,775* | × | 7.50 | × | 5 | = | 259,790.00 |
| 1976–1/31/80 | 692,775* | × | 8.50 | × | 4.08 | = | 240,254.00 |
| | | | | | | | $ 680,165.00 |
| 1968–70 | $ 749,437* | × | 6.50 | × | 3 | = | $ 146,140.00 |
| 1971–75 | 749,437* | × | 7.50 | × | 5 | = | 281,038.00 |
| 1976–1/31/80 | 749,437* | × | 8.50 | × | 4.08 | = | 259,904.00 |
| | | | | | | | $ 687,082.00 |
| 1969–70 | $ 715,721 | × | 6.50 | × | 2 | = | $ 93,044.00 |
| 1971–75 | 715,721 | × | 7.50 | × | 5 | = | 268,395.00 |
| 1976–1/31/80 | 715,721 | × | 8.50 | × | 4.08 | = | 248,212.00 |
| | | | | | | | $ 609,651.00 |
| | | | | | | | $6,070,507.00 |

2/1/80
(to date of
payment of
judgment) $\quad - \$5,649,048 \times \dfrac{.12}{365} = \$1,857$ per day (@ 12 percent per annum.)

---

* Includes the basic royalty compensation due for the procurement of 1307 fuel controls directly from Woodward Governor Company.

## APPENDIX E–2

### DELAY COMPENSATION
(MFC Systems)

| Period | Basic Comp. | | Delay Rate | | Years | Amount Due |
|---|---|---|---|---|---|---|
| May 1, 1962 to Dec. 31, 1965 | $ 1,057,136.00 | × | 4.75 | × | 3.67 | $ 184,285.00 |
| Jan. 1, 1966 to Mar. 31, 1967 | 1,057,136.00 | × | 6.50 | × | 1.25 | 85,892.00 |
| Apr. 1, 1967 to Dec. 31, 1970 | 2,173,571.90 | × | 6.50 | × | 3.75 | 529,808.00 |
| Jan. 1, 1971 to Dec. 31, 1975 | 2,173,571.90 | × | 7.50 | × | 5.00 | 815,089.00 |
| Jan. 1, 1976 to Jan. 31, 1980 | 2,173,571.90 | × | 8.50 | × | 4.08 | 753,794.00 |
| | | | | | | $2,368,868.00 |

2/1/80
(to date of
payment of
judgment) $\quad - \$2,173,571.90 \times \dfrac{.12}{365} = \$715$ per day (@ 12 percent per annum.)

## APPENDIX F

SUMMARY

| | |
|---|---:|
| Basic Compensation (Appendix D) | $ 7,822,619.90 |
| Delay Compensation (Appendix E-1) | 6,070,507.00 |
| Delay Compensation (Appendix E-2) | 2,368,868.00 |
| | $16,261,994.90 |

Delay compensation of $2,572 per day from February 1, 1980, to date of payment of judgment @ 12 percent per annum calculated as follows: