### DYNAMICS CORPORATION OF AMERICA, Plaintiff,

v.

### The UNITED STATES, Defendant,

and

### Electronic Associates, Inc., Third-Party Defendant.

No. 258–67.

United States Claims Court.

June 8, 1984.

---

Thomas P. Dowling, Morgan, Finnegan, Pine, Foley & Lee, New York City, for plaintiff. Janet Dore, Anthony Amaral, Jr., New York City, C. Larry O'Rourke, and Richard L. Stroup, Houston, Tex., of counsel.

William O. Geny, Washington, D.C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D.C., for defendant. Vito J. DiPietro, Washington, D.C., of counsel.

Jack Posin, Arthur, Dry & Kalish, New York City, for third-party defendant.

## OPINION

COLAIANNI, Judge.

This is the accounting phase of a suit brought under 28 U.S.C. § 1498 to recover reasonable and entire compensation for the unauthorized use and manufacture by or for the United States of plaintiff's patented invention. In *Rel-Reeves, Inc., Successor to Dynamics Corp. of America v. United States,* 209 Ct.Cl. 595, 534 F.2d 274 (1976), claims 7, 8 and 13 of plaintiff's United States Letters Patent No. 2,967,997 ('997) were found to be valid and infringed. The court is now called upon to fix the reasonable and entire compensation to which plaintiff is entitled.

The parties have entered into a stipulation regarding the dollar volume of a portion of the analog computers purchased by defendant. Many questions, however, remain to be resolved. These include: the type of procurement which is part of the infringing combination; the relevant accounting period; whether plaintiff timely instituted an administrative claim to toll the statute of limitations; the procurement which is to be included in the royalty base; the royalty rate to be used; whether plaintiff is entitled to litigation expenses; the interest rates to use to calculate plaintiff's delay damages; and whether the plaintiff is entitled to compound interest in the award of delay damages. In turn, each of

these questions has a number of subquestions which must be considered.

### Commencement of Accounting Period

The patent in suit issued on January 10, 1961. To hold the defendant accountable for the unauthorized use of his invention from that date forward, it was necessary for plaintiff to either file a petition[1] in court or toll[2] the statute on or before January 10, 1967.

Plaintiff mailed letters to thirteen departments and agencies of defendant on January 6, 1967. The letters were received on January 9 or 10, 1967. There is no question that they were timely filed and that they would have effectively tolled the six-year statute from running, if the letters complied with the provisions of the Armed Services Procurement Regulation (ASPR)[3] covering such matters.

■ Defendant argues that the letters were not satisfactory to toll the statute because they failed to adequately identify the accused procurement by manufacture and model number, as required by ASPR. Defendant's argument is unpersuasive. In the first place, the letters identified the patent and identified the accused items as "general purpose analog computers with the checking system of the [plaintiff's] patent." The administrative claim letter of plaintiff can in no way be likened to that used in the case of *Custer v. United States*, 224 Ct.Cl. 140, 146, 622 F.2d 554, 558, *cert. denied*, 449 U.S. 1010, 101 S.Ct. 565, 66 L.Ed.2d 468 (1980), in which the letter failed to identify one of the patents plaintiff was accusing the government of infringing.

There is little doubt that plaintiff's notice was sufficiently detailed to offer the government a realistic opportunity to consider and settle the claim. That this is so is clear beyond guess or supposition since two of the thirteen recipients of the letters, the National Aeronautical and Space Administration and the Atomic Energy Commission, found it to be acceptable as filed.

■ Plaintiff filed its petition in this case on August 10, 1967. The filing of a petition terminates the pending administrative claim, but plaintiff's claim was tolled for the seven-month period that the administrative claim was pending. When seven months are added to the six years provided by 28 U.S.C. § 2501, the relevant accounting period begins on January 10, 1961, the issue date of the patent in suit. The accounting period then spans the entire seventeen-year life of the patent and terminates on the expiration date of the patent, January 10, 1978. Moreover, all accused computers which were purchased prior to January 10, 1961, but were on hand and used after that date are infringements. *See Coakwell v. United States*, 178 Ct.Cl. 654, 657–58, 372 F.2d 508, 510 (1967).

### Compensation Base

Although the parties are in partial agreement regarding the procurement which

---

**1.** 28 U.S.C. § 2501 enables a recovery for six years prior to the filing date of a petition.

**2.** 35 U.S.C. § 286 provides:

Except as otherwise provided by law, no recovery shall be had for any infringement committed more than six years prior to the filing of the complaint or counterclaim for infringement in the action.

In the case of claims against the United States Government for use of a patented invention, the period before bringing suit, up to six years, between the date of receipt of a written claim for compensation by the department or agency of the Government having authority to settle such claim, and the date of mailing by the Government of a notice to the claimant that his claim has been denied shall not be counted as part of the period referred to in the preceding paragraph.

**3.** ASPR § 9–404(a)(4) provided in pertinent part:

(a) A patent infringement claim for compensation, asserted against the United States under any of the applicable statutes cited in § 9.402, must be actually communicated to and received by a Department, agency, organization, office, or field establishment within the Department of Defense. Claims must be in writing and should include the following:

\* \* \* \* \* \*

(4) A sufficient designation of the alleged infringing item or process to permit identification, giving the military or commercial designation, if known, to the claimant; \* \* \*.

should be included in the compensable procurement base, a large number of differences still exist. While the parties agree that the claims define the royalty base, there is no agreement as to the scope of the claims.

In essence, the defendant argues that the scope of the claims in suit dictates that the base of infringing systems should be confined to the cost of modifying an analog computer to enable it to perform the patented checking operation. Thus, defendant points to testimony introduced at trial by the plaintiff concerning the cost of modifying an analog computer to perform problem checks. Specifically, plaintiff's testimony established that it would cost approximately $10,000 to enable a $500,000 analog computer to perform the operation. Defendant jumps on this statement like a dog on a bone and in its haste abandons the theories advanced by its experts at trial.[4] Although the shift is attributed to the newly found expedient, a more realistic appraisal, based on a careful reading of the testimony of record, indicates that the shift was made after the defendant's appointment theory proved unconvincing.

The above argument is, of course, similar to defendant's unsupportable theory that the claims in suit are limited to the checking circuit. Defendant points to the claims in suit, 7, 8 and 13, and insists that the preambles[5] limit the claims to the relays, resistors, etc., needed to perform the checking operation, on the basis that the preamble merely sets forth the environment in which the checking circuit is to be used, but forms no part of the claimed structure. This argument fails to appreciate the nature of the construction utilized by the claims in suit. These claims are patterned after the form approved in *Ex Parte Jepson*, 243 O.G. 525 (1917). *Jepson* claims are customarily in two parts with the preamble, which recites the structure that sets the stage for the improvement, being divided from the improvement by the phrase "the improvement comprising" or "the combination comprising."

However, defendant's argument that the preamble forms no part of the patented combination is an oversimplification. A similar argument was rejected in *Wells Mfg. Corp. v. Littelfuse, Inc.*, 547 F.2d 346 (7th Cir.1976). The *Wells* court held that an element which was recited in the preamble was nevertheless a part of the patented combination. The court quoted with approval from *Ex Parte Lennon*, 140 USPQ 67, 70 (Pat. Office Bd. of Appeals 1963):

> According to the weight of authority, where the preamble of a claim is tantamount to a statement of mere adaptability or intended use, i.e., with the remaining part of the claim being a self-contained description of structure not de-

---

**4.** Defendant unpersuasively explained:
> This was not the approach originally taken by Mr. Glassman [defendant's expert witness on licensing] who attempted to simply use the main frame analog computer price and apportion the price based upon factors that would, in essence, have made the royalty payable on the invention as opposed to the other unpatented portions of the analog computer. This analysis is, of course, unnecessary if one knows the actual cost of the invention.

**5.** The preambles of these claims provide:
> 7. In an analog computer including an integrating circuit, said integrating circuit having input and output terminals coupled to the remaining elements of said analog computer for forming a closed-loop feedback system, the combination for testing the analog computer system comprising * * *.
> 8. In an analog computer including an integrating circuit having an amplifier with input and output terminals and a common terminal, said integrating circuit including condenser means coupled between the input and output terminals of said amplifier and further including an input resistor coupled in series with the input of said amplifier, said integrating circuit being coupled to the remaining elements of said analog computer for forming a closed-loop feedback system, the combination for testing the analog computer system comprising * * *.
> 13. Apparatus for testing an analog computer including at least one integrating circuit, said integrating circuit having an input coupled to first terminal means of the remaining elements of the computer and an output coupled to second terminal means of the remaining elements of the computer to form a closed-loop system, the input of said integrating circuit including a series input resistor, comprising in combination, * * *.

pending for completeness upon the preamble, the latter is not a patentable limitation in the claim and, hence, structural elements recited therein are not parts of the claimed combination. As a correlary [sic], where the body of the claim refers back to structure recited in the preamble and depends for completeness on such structure, then such structure becomes a part of the claimed combination.

*See* 547 F.2d at 353.

■ In applying this test to the claims at bar, it is clear that the preambles do more than merely set out the purpose or intended use of the *testing circuitry.* The switching means, fixed test voltage, etc., cannot be understood alone and only make structural sense when read in the context of the elements recited in the preamble. Indeed, the dependency upon elements recited in the preamble is evident from a reading of the claims, which refer to various structural elements recited in the preamble. For example, in the body of the claim the phrase "switching means coupled to said integrating circuit," is found. The integrating circuit referred to is set forth only in the preamble, and this is the reason that it can be referred to as "said" integrating circuit. In addition, the claims called for the "switching means * * * [to open] the loop of the feedback system and * * * [render] said integrating circuit ineffective." The claim is again referring back to the integrating circuit that is set out in the preamble, but, in addition is also referring to a feedback system that is also defined only in the preamble. As in *Wells,* it must be concluded that the elements of the claim are so intimately associated with the various elements making up the analog computer recited in the preamble that the computer must be regarded as part of the combination.[6]

The parties also disagree as to whether hybrid computer arrangements are covered by claims 7, 8 and 13 of the patent in suit.

A hybrid computer is one which has both analog and digital computing sections. Shortly after the issuance of the McCoy patent in suit, in 1961, the analog computer industry began to increasingly use digital hardware and digital techniques to enable the simulation of ever changing complex systems. In time, this evolved into the development of the so-called hybrid computer. Although these computers varied in makeup, with some having a greater digital capability than others, the hybrid system included in this phase of litigation was analog computer oriented. Thus, the principal mode of simulation was by means of analog components.

The testimony of record clearly establishes that the digital section of a hybrid computer facilitates a number of problem check functions. The functions include the precalculation of expected voltages, the introduction of test voltages, the readout of resultant problem voltages, the automated comparison of those readings with precomputed values and the mode switching functions. Nor is there any dispute that in hybrid systems, digital computation is employed within closed-loop analog computing circuits. However, the parties disagree on the readability of the claims in suit on hybrid configuration in the check mode operation to which the claims in suit apply.

Defendant argues that a break in the first order loop occurs at the analog to digital interface of the system. For support defendant points to the testimony of Mr. Robert Harnett, who at the time of his testimony was the Chief of the Hybrid Simulation Division at the Computer Center of Wright Patterson Air Force Base. In describing the test operation of a loop, which includes digital portions of the hybrid set-up, Mr. Harnett testified that the Computer Center at Wright Patterson would break the loop at the interface and not transfer the voltage values generated by the analog circuitry into the digital computer portions.

6. *See also Railroad Dynamics, Inc. v. A. Stucki Co.,* 727 F.2d 1506 (Fed.Cir.1984) (interpretation of *Jepson* claims in accounting context).

In an example involving the following circuit, Mr. Harnett testified:

> Well * * * the digital computation of * * * [sine] theta [output of amplifier 14] and * * * [cosine] theta [output of amplifier 15] represents the computation of values that are loaded into those DAC's [digital to analog convertor] which then propagate into the analog circuitry, and this angle theta itself, in the normal course of computation, is read by the ADC [analog to digital convertor], and it comes from the integrator in the lower left-hand corner.

When we are checking the analog circuitry, we go out of our way to not let information be transferred through the digital computer. We break the loop within the digital code. We break the loop at the ADC. For example, you know what theta is, because you are going to have to set a Problem Check value to it for that particular integrator in the lower corner. If you know theta, you also can calculate, even in a math table or digital computer itself, you can calculate sign [sine] theta and cosign [cosine] theta.[7]

*Fig. 1B of Plaintiff's Ex. 276*

Defendant thus argues that the test voltage is incapable of "being translated through said open-loop system to the input of said integrating circuit," as required by the claims in suit.

Plaintiff, on the other hand, says that the above arrangement is the equivalent of the circuit shown in Fig. 1 of the McCoy patent, with the difference being that the resolver servo of Fig. 1 has been replaced by the digital computer and the ADC and DAC. Plaintiff also argues that defendant has taken a literal, narrow interpretation of

the claims and that in reality the digital computer functions in the same way and generates the same result as the resolver servo. Plaintiff contends that the use of the digital computer as described by Mr. Harnett does not differ in any meaningful way from the arrangement which was found to be an infringement during the liability phase of this litigation. In support, plaintiff points to Fig. 1 of the patent in suit and, in particular, to the single loop made up of integrator 10, resolver servo 12, inverter amplifier 15, high gain amplifier 22, attenuating amplifier 23, and back to integrator 10 by way of potentiometer 24.

---

**7.** Trial transcript, at 550–51.

Plaintiff argues that defendant's position is unacceptable because all single-order closed loops have computing elements which modify, manipulate, add to, terminate, and otherwise operate on the test voltage. The resolver servo 12 of Fig. 1 of the patent, for example, translates the voltage at its input into a shaft position of the servo mechanism. Similarly, in the hybrid system above, defendant has merely opened the circuit at the input to the ADC and replaced the voltage which appears at that point, and is representative of the angle theta (Θ), by a voltage which exactly represents the desired test angle. In this way, the accuracy of the voltage which reappears at the DAC interface is ensured since it is made equal to the calculated value that results from a solution of the static algebraic equation.

■ A review of the relevant trial transcript convinces the court that the hybrid configuration merely substitutes a computer calculated voltage for actual loop generated voltage. This is done to ensure that the computer inputs the correct voltage value at the output of the DAC. Such a substitution operates to translate a voltage through the computer and the open-loop system in a similar fashion to the resolver servo of Fig. 1 of the patent.[8] Thus, the court concludes that the dollar volume of hybrid computers during the relevant accounting period should be included in the compensatory base.

During the prior liability trial this court found, by way of finding of fact 49, that circuit diagram X500–C was representative of the following computers: Beckman 2100, 2200; Electronic Associates, Inc. (EAI) 231R, 231RV, 2000 (hybrid computer combining 231R and digital), 2400 (hybrid computer combining 231RV and digital), 8800 (solid-state hybrid computer); and Applied Dynamics AD–4 (solid-state hybrid computer). However, by later action, counsel agreed to the deletion of the AD–4 from the stipulated list of computers. The prior trial concluded that each of the above-identified computers infringed claims 7, 8 and 13.

Plaintiff now claims that purchases by defendant of the EAI 221R and the AD–4 infringe claims 7, 8 and 13 of the patent in suit. Since these were not computers that were accused of infringing the patent in the prior liability trial, plaintiff has the burden, as announced in *Marconi Wireless Telegraph Co. v. United States*, 99 S.Ct. Cl. 1, 65, *modified on other grounds*, 320 U.S. 1, 63 S.Ct. 1393, 87 L.Ed. 1731 (1943), and *Pitcairn v. United States*, 212 Ct.Cl. 168, 179–80, 547 F.2d 1106, 1114 (1976), *cert. denied*, 434 U.S. 1051, 98 S.Ct. 903, 54 L.Ed.2d 804 (1978), of showing that they are similar to the structures that have been found to infringe.

Turning our attention first to the EAI 221R, plaintiff points to an October 23, 1967 letter from EAI's secretary and counsel, Edward A. Petko. Mr. Petko, in discussing the use of false initial condition [i.c.] on a variety of EAI computers, stated:

You are of course aware that present machines have a number of holes (I believe six or eight) on the patch panel which are energized when the S.T. [static test] button is depressed. It is common to patch from these holes to the I.C. [initial condition] terminal of integrators which have zero I.C. so as to provide a "false I.C." for check purposes. This group of holes is automatically deenergized to remove the false I.C.s when the machine is put into an operate mode. As far as I can determine this fixture may have been placed on some 31–Rs and 131–Rs but I can speak with certainty only with respect to the 221–Rs and 231Rs where such was a standard feature.

Plaintiff also directs the court's attention to an advertisement attached to the Petko letter. The advertisement is for a 221R

---

**8.** Dr. Albert S. Jackson, who appeared as an expert witness on behalf of plaintiff, testified that static test voltages have been propagated through first order loops that include digital equipment to perform a problem check operation on the entire combination, including the DAC, the digital computer, and the ADC.

system and indicates that its console can be modified, at additional cost to the purchaser, to incorporate static tests and static checks.

On the other hand, defendant directs the court to an operating manual of the 221R machine. That manual does not list static test as one of the modes available to the user of the equipment. A check referred to in the manual permits the operator to monitor the summing junction.

■ The evidence before the court clearly shows that the EAI 221R did not provide, as a standard feature, automatic false i.c.'s. In fact, the machine was limited to checks of the summing junction. The court accordingly concludes that plaintiff has failed to show the similarity required by *Marconi* and *Pitcairn* between the EAI 221R and the previously adjudicated infringing computers.

The court now turns to the AD–4, a hybrid machine which incorporates both analog and digital sections. The previous conclusions regarding the applicability of the McCoy patent, and claims 7, 8 and 13 particularly, to hybrid computers applies in this instance also. The defendant, however, raises additional arguments to support its contention that the AD–4 is not similar to any of the other infringing machines and that it should not be included in the accounting under the *Marconi* and *Pitcairn* holdings. Defendant particularly contends that the AD–4 does not provide the automatic removal of test i.c. voltages and the machine is thus not similar to the machines which have been found to be infringements during the liability trial.

The testimony of Dr. Albert S. Jackson, who earned his doctor's degree in engineering from Cornell University and held a variety of important consulting positions in the field of analog computers, indicates that the AD–4 not only had provisions for the automatic removal of false i.c. voltages, but also enabled access to the summing junctions.[9] In fact, the record establishes that the AD–4 did have a provision for the automatic removal of false i.c. voltages. False i.c. voltages could be provided by programming the digital computer to insert the test voltages at the proper circuit locations and, following the running of the test, remove the test voltages so that the computer could continue with its computation.[10]

Dr. Jackson testified that false i.c. voltages could also be provided by manipulating the logic patchboard of the machine, but he did not have enough information on the AD–4 computer in front of him to explain exactly what connections had to be made. He specifically stated:

Oh, if you didn't have the digital computer and you wanted to make this automatic, that is, the dropping out of the problem verify, you would either use logic level signal, which would require a patch, require a patch cord to be placed into the output—the operate mode, into the input to the signal which resets that flip-flop latch, or you would have to have one form of the little push-button decoding matrix which had a diode in place where the operate mode would automatically reset that flip-flop.

■ The evidence shows that problem check was an important test procedure that would have been employed by all users of analog computers if it was available. This is equally true in the case of the AD–4 since the false i.c. voltages could be automatically provided for either by programming the digital computer, or by simply

---

**9.** Defendant's argument that Dr. Jackson's testimony was based on speculation is not persuasive.

**10.** Dr. Jackson testified, in response to a question regarding how the AD–4 could be provided with an automatic false i.c. feature:

> Now, if you were using a digital computer to run the test [automatic false i.c. in a problem verify mode] which is the way you do it, if you had a computer connected up to it, and

this is the way it was meant to be used, really, the program itself is what sets the bit pattern into that register to a 16-bit register, the control register, and then you would put in the bit pattern and put it into the problem verify mode, read all the initial derivatives through the check, and then simply you have to write another value out to that register in order to put it into the run mode.

patching a chord in the proper location of the logic patchboard of the computer. On the basis of the evidence of record, it is concluded that the AD–4 is similar to the previously adjudicated infringing system.

The next area of contention between the parties concerns whether or not peripheral devices, expandable units, and spares should be included in the compensatory base. Plaintiff argues that these purchases should be included. Plaintiff points out that the peripheral devices perform much like the digital portion of the previously discussed hybrid computers in that they provide automatic adjustment of i.c. voltages, measure the output of all problem variables, and perform required mode switching operations. With regard to the expandable devices, plaintiff contends that they are typical modular computer building blocks—*i.e.*, summers, integrators, etc.— that became part of the repertoire of the expanded computer. Enlarging on its argument, plaintiff contends that once they are made part of the computing system they are used in practicing the invention in closed loop feedback systems.

■ Defendant, on the other hand, argues that there is no evidence in the record to support plaintiff's assertion that the peripheral devices are similar to any of the components of the circuitry found to be an infringement during the previous liability trial. The court does not agree, and finds ample support to ensure the similarity of the peripheral devices to the previously adjudicated circuit components. Since plaintiff's arguments are correct, it is concluded that plaintiff has met its burden of proof with regard to the inclusion of the procurement costs for the peripherals into the royalty base.

■ However, no proofs were received from plaintiff regarding the expandable devices. This area appears to be an after-thought on the part of plaintiff. The lack of proof makes it impossible to determine the accuracy of plaintiff's argument. Since plaintiff has failed to carry its burden of proof, it must be concluded that the costs of the expandable devices cannot be included in the royalty base.

We turn next to plaintiff's arguments for the inclusion of the cost for spare parts into the royalty base. This area covers sales of computer components, such as summers, integrators, multipliers, and similar modular units to customers who have previously purchased a total system. Plaintiff argues that these components are not consumables that are used to replace worn out or broken down items, but are standbys which can be substituted for in-place computing blocks when those items are suspected of being faulty. The faulty component will then be repaired and placed in the pool of available parts.

■ Defendant objects to the inclusion of these costs into the royalty base for several reasons.[11] In substance, defendant argues that plaintiff has not met its burden to show that the parts are indeed used as suggested and that the parts may be used to reconstruct the claimed invention. Under *Calhoun v. United States*, 197 Ct.Cl. 41, 453 F.2d 1385 (1972), and *General Electric Co. v. United States*, 215 Ct.Cl. 636, 697–710, 572 F.2d 745, 778–86 (1978), a user has a right to repair and to continue to use the patented combination without the payment of additional royalty.

■ Plaintiff has not directed the court to any place in the record to substantiate its charge that the spares were being used as substitutes for suspected components. Since plaintiff has not met its burden of proof, it must be concluded that the cost of the spares is not to be included in the royalty base.

---

11. One of the arguments which defendant raises is the inclusion by plaintiff of sales of "parts" to commercial entities who presumably are doing work on a contract basis for defendant. Defendant points out that some or all of those costs may be excludable because it may have a license from the manufacturer to use the particular computer system involved. If they are not licensed, defendant argues, it may not be responsible for the costs because the commercial establishment may be doing work for a number of commercial accounts. To charge defendant with 100 percent of the spare parts cost under such circumstances would obviously be unfair.

■ Having proceeded through a maze of issues dividing the parties on procurement which was or was not to be included in the royalty base, it next becomes necessary to determine the royalty rate for the invention in suit. However, before embarking on this task, it is important to quickly set forth a few legal principals which apply. In the first place, it has been established at least since *Crozier v. Krupp*, 224 U.S. 290, 32 S.Ct. 488, 56 L.Ed. 771 (1912), that when a patented invention is made or used by or for the United States, the United States takes by eminent domain a compulsory, nonexclusive, compensable license under the pertinent claims. Since the taking of a license is viewed as an eminent domain taking, the patentee whose invention has been appropriated is entitled to compensation under the fifth amendment to the Constitution.

■ The Court of Claims, our predecessor court, has clearly differentiated between the recovery which is available in patent litigation between private citizens and the eminent domain recovery available against the government. The ultimate goal in all accounting cases is to compensate the patent owner for what he has lost as a result of the infringer's actions. In the Claims Court, the compensation to which a patent owner is entitled is evaluated from the point of view of the patentee and not from the view of the infringer. This standard was clearly stated in *Leesona Corp. v. United States*, 220 Ct.Cl. 234, 252, 599 F.2d 958, 969, *cert. denied*, 444 U.S. 991, 100 S.Ct. 522, 62 L.Ed.2d 420 (1979): "The proper measure in eminent domain is what the owner has lost, not what the taker has gained."

Although in the usual accounting case a variety of theories have been used to place the patent owner in the same position that he would have been if a taking had not occurred, the parties are in agreement that a reasonable royalty rate should be used in this instance. The plaintiff contends that at a supposititious license negotiation between a willing buyer and a willing seller, since there is no established industry royalty rate, the following factors would have been relevant to the establishment of a reasonable royalty rate:

(1) The validity of the subject patent;

(2) The state of development of the licensed technology;

(3) The cost of awarding the patent, or in other words, the availability and cost of noninfringing equivalent alternatives;

(4) The contribution of the technology, including cost savings, to larger programs; and

(5) The existence of a market for the invention.

Plaintiff urges that these considerations would have resulted in an agreement to pay a royalty of 7% for a license under the patent in suit.

The defendant agrees that a supposititious negotiation between a willing buyer and a willing seller is the expedient to use in setting a royalty rate in the instant case. However, defendant interprets the facts differently from plaintiff. Defendant also emphasizes different factors and considerations from those advanced by plaintiff. Defendant thus urges that any such negotiation would be conducted with the knowledge by both parties of the standard or prevailing industry rate for the technology involved. Defendant would also narrowly construe the claims, excluding the cost of the computer, and focus on the costs required for the hardware to construct a problem check circuit. Moreover, defendant urges that a 28 U.S.C. § 1498 accounting should focus on the "loss" to the plaintiff and not the use to which the invention was put by defendant in arriving at the compensation that a plaintiff is entitled to for an eminent domain taking of a license. Defendant would thus ignore the importance of the plaintiff's invention in carrying out government programs for the national defense or to advance space exploration. The defendant also urges that the large guaranteed volume of royalty bearing apparatus that the government procured would be an important factor in the hypothetical negotiation. That alternatives

were available to the defendant to accomplish the same result as the patented invention is also a factor upon which defendant would place a heavy emphasis. Finally, defendant would factor into the royalty setting equation the rates at which defendant has granted licenses under its patent.

■ While it hardly needs repeating, it must be recalled that by resorting to a hypothetical negotiation, the court is attempting to establish a royalty which will adequately compensate the patentee for his loss. In this supposititious setting, we have a licensor who is willing to grant a license, but does not have to, and a licensee who is willing to take a license, but does not have to. *Deere & Co. v. International Harvester Co.*, 710 F.2d 1551 (Fed.Cir. 1983). Moreover, it is of no consequence that the patentee would never have granted a license nor that neither party would have been willing to enter into an agreement. *Tektronix, Inc. v. United States*, 213 Ct.Cl. 257, 552 F.2d 343 (1977), *cert. denied*, 439 U.S. 1048, 99 S.Ct. 724, 58 L.Ed.2d 707 (1978).

■ It is also important to clearly establish when the hypothetical negotiation is presumed to have taken place. Since a court is called upon to determine the royalty for the entire accounting trial, there is but one answer to this question, and that is that the supposititious negotiation is viewed as taking place at the time that the infringement first began. *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075 (Fed.Cir.1983). In this instance, it would have taken place at the time the patent issued, *i.e.*, January 10, 1961.

Defendant would have urged then, as it does now, that the claims had to be narrowly construed. Plaintiff would, of course, have taken the opposite view. For reasons which have previously been explained, the court feels that the invention is not confined, as defendant urges, to a few relays, switches and voltage sources. In the first place, problem check is conducted on the

computer. A closed loop is necessary to practice the check. In reality this may mean that the test voltages will flow through large portions of the computer since many first-order loops may be interconnected in the configuration which is set up to solve a particular problem. In addition, depending upon the extent and number of modifications that are made to a circuit, other loops may be tested in arriving at the solution of a problem. Thus, as explained, the invention includes the entire computer.

The CAFC recently faced a similar issue in *Railroad Dynamics, Inc. v. A. Stucki Co.*, 727 F.2d 1506 (1984).[12] The infringer felt that, because of their *Jepson* claim format, some of the claims should be narrowly construed to cover a biasing spring. Thus the infringer objected to the district court's use of the cost of a snubber assembly in calculating the patentee's recovery. The selling price of a carset was $416.19, while the sales price of four biasing springs came to $40.

In upholding the district court's use of the carset as the compensation base, the CAFC explained that: "The parties sell and customers buy snubber assemblies, not merely biasing springs. RDI's [the infringer's] arguments against the application of the royalty rate to the selling price of snubber assemblies are without merit." *Id.* at 1519. The same considerations apply in the case at bar. Purchasers buy the computers with problem check in place. They do not buy a problem check module. Accordingly, the court finds unpersuasive defendant's argument that the royalty rate upon which the parties would have agreed at the hypothetical negotiation would have been minimal because the scope of the claims indicates the relative unimportance of the patent.

Defendant also argues that plaintiff's past licensing practices would have played an important role in the hypothetical nego-

**12.** While some of the claims in *Railroad Dynamics* were in a *Jepson*-type format, at least one of the claims was not.

tiations to limit the royalty to a one-to-three percent range. Defendant relies on offers and negotiations for licenses between plaintiff and Beckman Instruments and EAI. The Beckman negotiations appear to have begun in early 1963. It appears that the negotiations were directed at accomplishing a number of objectives, including discussing "the matter of a negotiated amount on any past infringement of the McCoy patent, No. 2,967,997." The EAI negotiations began on February 9, 1962, and while there was no litigation pending at the time, the meeting was set up to enable plaintiff to discuss possible infringement by EAI of the McCoy patent.

Eventually, plaintiff sued both EAI and Beckman for infringement of the McCoy patent. In addition, plaintiff filed suit in our predecessor court to cover the 28 U.S.C. § 1498 claims it had against the government.

Plaintiff has opposed the use of the offers and settlements arrived at with Beckman and EAI on the basis of Rule 408 of the Federal Rules of Evidence (FRE). Plaintiff also proposes, as a fallback position, that the offers and settlements should be given little weight in this proceeding because they were conducted while all of the parties were suffering from severe cash problems and facing the prospects of continuing litigation in a number of different forums.

Plaintiff similarly argues that at the time of the EAI settlement both it and EAI were suffering from critical money shortages and struggling to survive. Plaintiff contends that the fear that EAI was going to fail prompted it to settle. In addition, at the time of the EAI settlement, plaintiff was controlled by creditors who were intent on salvaging the monies due them. Under these circumstances, plaintiff argues that "the EAI settlement is not a reliable guide for predicting the outcome of a licensing negotiation; nor does it suggest the existence of an established royalty."

The question of whether or not offers or settlements can be used to show the existence of an established royalty or the prior licensing practices of a patentee is a continuing problem. *See Jamesbury Corp. v. United States*, 207 USPQ 131 (Ct.Cl. Trial Div.1980), where the subject was extensively discussed. The Court of Claims has permitted the use of settlement agreements. *See Saulnier v. United States*, 161 Ct.Cl. 223, 314 F.2d 950 (1963); *Pitcairn v. United States*, 212 Ct.Cl. 168, 547 F.2d 1106.

However, the subject has received considerable attention in a number of recent accounting decisions at the CAFC. *See, e.g., Railroad Dynamics, Inc. v. A. Stucki Co.*, 727 F.2d 1506 (Fed.Cir.1984); *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075 (Fed.Cir.1983); *Deere & Co. v. International Harvester Co.*, 710 F.2d 1551 (Fed.Cir.1983). On the basis of these cases, it appears that the majority view of the CAFC is to exclude efforts, offers and settlements directed at compromising a disputed claim. The court in *Deere* would only invoke Rule 408 and exclude the use of offers and settlements if there is an actual dispute over an existing claim. Rule 408 should not be used to exclude offers that are made when disputes do not exist, even if litigation eventually results.

In this case, there is no serious dispute that the Beckman and EAI negotiations and settlements were made at times when existing claims and actual disputes concerning patent infringement divided the parties. Thus, these negotiations and settlements will be given no weight. Similarly, these offers and settlements could not have been used by defendant in this case during its hypothetical negotiations.

The plaintiff argues that since its patent has been held valid by the United States District Court for the Central District of California and the United States Court of Appeals for the Ninth Circuit,[13] as well as by the Court of Claims, it should be

---

13. *Reeves Instrument Corp. v. Beckman Instruments, Inc.*, 161 USPQ 450 (C.D.Cal.1968), *aff'd*,

444 F.2d 263 (9th Cir.), *cert. denied*, 404 U.S. 951, 92 S.Ct. 283, 30 L.Ed.2d 268 (1971).

able to urge that it is entitled to a higher royalty rate. Plaintiff contends that its negotiating posture would have been improved because the risk of invalidity was removed from the licensee's consideration. While this is true, it is equally true that a finding of validity is not entitled to any collateral effect, as would be the case if a patent is found to be invalid. *Blonder-Tongue Laboratories, Inc. v. Univ. of Illinois Foundation*, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971). Thus the licensor-patentee could never be sure a court in the future would not find the patent to be invalid on new art.

Plaintiff also points to the widespread use and popularity which the invention was experiencing on the 1961 date it issued as an additional factor which would justify a 7% royalty rate. The record does show that problem check was incorporated in most computers which were sold during the life of the patent. While it started as an optional feature, the strong demand for the test soon made it a standard feature on all computers.

However, plaintiff's argument misses the mark because it has totally ignored the fact that the value of some patents can decline over time. *See Pitcairn v. United States*, 212 Ct.Cl. 168, 547 F.2d 1106. Indeed, that is what happened in this case, not so much because of the diminished value of problem check, but because alternatives to analog computer technology were quickly developing. Thus, although problem check remained an important part of analog and hybrid computers, advances in digital computer technology were occurring so quickly that more and more problems that at one time would have been simulated on analog computers could be more quickly and accurately solved on digital computers. Thus the market percentage of analog computers dropped dramatically after the 1961–65 period. This would undoubtedly be an important consideration in any licensing negotiation and one which would work to adjust downwardly the 7% rate suggested by plaintiff.

While defendant urges that various alternatives could be used to perform the same functions as problem check, the record does not support such a finding. A digital computer check could be used, but this alternative was not as useful, for even if a difference resulted, it was difficult to establish just what caused the error. Also, at least in the early years, the costs for running digital checks were expensive. These factors would work to increase the 1-to-3% rate suggested by defendant.

■ Defendant also urges that the large volume of procurement for which it is ultimately responsible should be considered in arriving at a royalty rate. Certainly, if the amount of compensatory base for which defendant is responsible was known at the time of the hypothetical negotiations, defendant certainly would have used this to wrangle the lowest royalty rate possible. *Cf. van Veen v. United States*, 181 Ct.Cl. 884, 386 F.2d 462 (1967); *Badowski v. United States*, 150 Ct.Cl. 482, 278 F.2d 934 (1960). While this court has in the past resorted to sliding scale royalty rates to overcome the lack of final procurement figures, this is not necessary in this instance since the final figures are now available. *Amerace Esna Corp. v. United States*, 199 Ct.Cl. 175, 182, 462 F.2d 1377, 1380–81 (1972). Thus the extent of procurement is a factor which will be given important consideration in arriving at a reasonable royalty rate.

■ It is also necessary to recognize that patent proceedings in this court are based on an eminent domain taking as distinguished from the tort oriented proceedings in district courts. The royalty arrived at by the willing buyer/willing seller approach, accordingly, has to be compatible with the "reasonable and entire" standard of 28 U.S.C. § 1498 and the "just compensation" standard of the fifth amendment. This is dramatically brought out in *Tektronix, Inc. v. United States*, 213 Ct.Cl. 257, 552 F.2d 343. After noting that Tektronix was making a 25% profit on nongovernmental sales of its product, the court concluded that a hypothetical negotiation in a 1498 cause of action would have resulted in

a 10% royalty rate. The court admitted that this result was—

> akin to a "jury verdict" but, in the absence of hard proof warranting the use of more precise standards, the "whole notion of a reasonable royalty is a device in aid of justice, by which that which is really incalculable shall be approximated. * * * It is no more impossible to estimate than the damages in many other torts * * *."

*Id.* at 271, 552 F.2d 343.

The court also went on to underscore the above point with the following observation:

> Nor should it be forgotten, when plaintiff's high profits are brought forward for comparison, that the standard of 28 U.S.C. § 1498—"reasonable and entire compensation"—was designed "to accomplish complete justice as between the plaintiff and the United States" under the just compensation clause of the Fifth Amendment. *Waite v. United States*, 282 U.S. 508, 509 [51 S.Ct. 227, 227, 75 L.Ed. 494] (1931). That goal of "complete justice" implies that only a reasonable, not an excessive, royalty should be allowed where the United States is the user—even though the patentee, as a monopolist, might be able to exact excessive gains from private users. Much of the content of the constitutional requirement of just compensation derives from the basic equitable principles of fairness as between the Government and its citizens. *See Almota Farmers Elevator & Warehouse Co. v. United States*, 409 U.S. 470, 478 [93 S.Ct. 791, 796, 35 L.Ed.2d 1] (1973); *United States v. Fuller*, 409 U.S. 488, 490 [93 S.Ct. 801, 803, 35 L.Ed.2d 16] (1973); *United States v. Commodities Trading Corp.*, 339 U.S. 121, 124 [70 S.Ct. 547, 550, 94 L.Ed. 707] (1950). It is equally a fundamental component of fairness to avoid excessive compensation to the condemnee as it is to be sure not to pay him too little.

*Id.* at 272, 552 F.2d 343.

■ After carefully considering all the arguments advanced by the parties' trial briefs, and especially the above factors, which include the importance advanced that problem check played in the use of analog and hybrid computers, the volume of procurement involved in this proceeding, the significant but diminishing role which analog and hybrid computers played in the years following the 1961–65 period, I conclude that a 6% royalty is justified in this case.

*Reformation of Settlement Agreement*

On December 29, 1972, plaintiff and EAI entered a settlement agreement to terminate the suit then pending in the United States District Court for the District of New Jersey. The stated intention of the parties was to settle "the aforesaid civil action and other controversies among them as provided herein." [14] In general, the settlement purported to provide EAI and its customers a release for the manufacture, use or sale of any infringing device. The government and plaintiff in the current action are now contesting the scope of one proviso, which stated:

> PROVIDED HOWEVER that nothing in this Agreement shall be construed as a release of or compensation for any claims or causes of action arising out of the use by or manufacture for the United States of apparatus embodying the subject matter claimed in said Patent, which apparatus was manufactured, leased used or sold by Defendants or their subsidiaries prior to the date of this agreement and which apparatus is the subject matter of Plaintiff Dynamics Corporation of America's suit against the United States in the U.S. Court of Claims, Action No. 258–67.

At issue is whether the parties to the settlement agreement intended to exempt from its coverage all § 1498 claims, including all prior use *for* claims, that were then pending in the present action before the Court of Claims. Defendant contends that

---

**14.** In addition to providing for settlement of the district court action, the agreement granted EAI a license for prospective manufacture, use and sale of the subject matter of the patent.

plaintiff preserved only its claims arising out of "use *by* or manufacture *for* the United States" (emphasis supplied), and settled all "use for" claims it may have in the instant action.

■ The record before the court, however, clearly establishes that the parties did not intend to settle these § 1498 claims. This was the testimony of representatives from both parties to the agreement.

Robert Skolnik, Esq., general counsel and assistant secretary to EAI at the time the settlement agreement was entered, testified in deposition that the agreement "didn't settle the Court of Claims action." In response to a question from plaintiff's attorney, Mr. Dowling, as to whether "[t]he object [of the agreement] was to preserve the plaintiff's rights in the Court of Claims action * * *," Mr. Skolnik said:

> My recollection is that at a meeting with Mr. Lozyniak, he told us because of his bankruptcy he could not settle the Court of Claims action, would we be agreeable in going forward on the Jersey action. We said we would and then left it to your firm and Arthur, Dry & Kalish to prepare suitable documentation because this was just one item in a very complicated transaction we were trying to work through at that time.

Similar testimony was given at trial by Edward J. Mooney, Esq., plaintiff's general counsel at the time the settlement agreement was entered.

Furthermore, in 1972 plaintiff was involved in bankruptcy proceedings in the Southern District of New York. The parties submitted the settlement to the district court for approval, with explanation of its scope. The court granted approval on December 19, 1972, with the understanding that the settlement's purpose, in part pertinent to the instant issue, was—

> to discontinue its [plaintiff's] suit for alleged patent infringement against Electronic Associates, Inc., now pending in the United States District Court for the District of New Jersey by a suitable release of all past damages involved in said action and a granting of a paid up, non-

exclusive license under the patent in suit covering the period from the date of settlement to the expiration of the patent * * *.

*In re Dynamics Corp. of America,* No. 72 B 750, order at 1 (S.D.N.Y. Dec. 19, 1972). No authority to settle the § 1498 claims before the Court of Claims was granted.

■ The parties' intention to preserve all § 1498 claims has been clearly established. The language, however, failed to accomplish that purpose. When a contract fails to reflect the understanding of both parties, reformation is appropriate. *See, e.g., Laboratory Supply Corp. of America v. United States,* 3 Cl.Ct. 722, 726 (1983); *Howard v. United States,* 2 Cl.Ct. 393, 398 (1983); *see generally,* A. Corbin, *Corbin on Contracts,* § 614 (1952). The savings provision is therefore reformed to preserve "any claims or causes of action arising out of the use by *or use for* or manufacture for the United States * * * prior to the date of this agreement * * *."

*Identity of Compensable Equipment*

The liability portion of this proceeding was tried on the basis of a single structure which the parties stipulated was "representative of static checking circuit conditions involving a representative integrator patched in a computer set up to solve a problem contained in certain designated computers." The representative system was designated as Exhibit X500C. The parties also stipulated that the circuit diagram of X500C was representative of the following computers: Beckman 2100, 2200; EAI 231R, 231RV, 2000 (hybrid computer combining 231R analog computer and a digital computer), 2400 (hybrid computer combining the 231RV analog computer and a digital computer), 8800 (solid-state hybrid computer); Applied Dynamics AD–4 (solid state hybrid computer which the parties later stipulated could be removed from the list); and Comcor Ci5000 (solid-state hybrid computer).

■ As a result of the hereinabove discussion regarding the similarity of hybrid

computers to the infringing computers, the AD–4 should be included in the class of infringing devices. Also, the Beckman settlement has eliminated the Beckman 2100 and 2200 systems from consideration. Thus the following systems are found to infringe the patent in suit: EAI 231R, 231RV, 2000 (hybrid computer consisting of the 231R analog computer and a digital computer section), 2400 (hybrid computer consisting of a 231RV analog computer and a digital computer section), 380, 580, 680, 7800, 8800; Applied Dynamics AD–4 and AD256; Comcor 500, 550, and Denelcer 450; Systron-Donner SD40, SD80 and SD80H.

### Procurement and Use by or For Defendant During the Accounting Period

■ Because of the settlement agreement between plaintiff and EAI, the accounting period for EAI runs from the issue date of the patent, January 10, 1961, to December 29, 1972 (the date of the settlement agreement). With regard to computers manufactured by parties other than EAI, the accounting period runs from the issue date of the patent, January 10, 1961, to its expiration date, January 10, 1978.

### a. Direct Sales to the Government

■ The parties have stipulated to the majority of the procurement that involves the direct sale of computers to the government. Defendant agrees that its purchases of the following systems infringe the patent in suit: EAI—231R, 231RV, 380, 580, 680, 7800 and 8800; and Applied Dynamics —ADI–AD256; Comcor—Ci500, Ci550, Ci5000/n and Denelcor 450; and Systron-Donner—SD40, SD80 and SD80H. In addition, because of the conclusions reached hereinabove, any combination of an above-listed EAI analog computer with a digital computer to form a hybrid computer is also found to infringe claims 7, 8 and 13 of the patent in suit. Also, all purchases by the defendant of the AD–4 systems was found to infringe and such sales should be included. In addition, the purchase price of all expandable or peripheral equipment which

is used with any of the above systems during the relevant accounting period should be included.

Finally, defendant objects to the inclusion of all purchases of GPS, CP or CSI computers into the accounting. Defendant correctly points out that no drawings, manuals or testimony were introduced at the trial to show that these computers were similar, as required by *Marconi* and *Pitcairn*, to the X500C representative circuit which was found to be an infringement during the liability trial. The table below shows the sales by EAI to defendant for the relevant years. Included as pre-1961 sales which were on hand and used by the defendant after the January 10, 1961, issue date of the McCoy patent. Excluded from the table are the procurement costs of expandables, since these were not found to infringe. The column labeled "OTHERS" covers the procurement cost of peripherals and digital components.

### EAI

Sales * of Computers and Related Equipment to the Government

| YEAR | TOTAL | ANAL. | OTHERS |
|------|-------|-------|--------|
| 1958 | 1,070 | 851 | 219 |
| 1959 | 3,299 | 2,957 | 342 |
| 1960 | 2,113 | 1,474 | 639 |
| 1961 | 3,594 | 2,764 | 830 |
| 1962 | 2,615 | 2,402 | 213 |
| 1963 | 3,314 | 2,624 | 690 |
| 1964 | 7,145 | 5,426 | 1,719 |
| 1965 | 2,800 | 2,060 | 740 |
| 1966 | 5,391 | 3,611 | 1,780 |
| 1967 | 3,563 | 2,438 | 1,125 |
| 1968 | 2,597 | 1,501 | 1,096 |
| 1969 | 5,317 | 3,217 | 2,100 |
| 1970 | 2,274 | 1,641 | 633 |
| 1971 | 1,957 | 1,482 | 475 |
| 1972 | 2,899 | 2,093 | 806 |
| Total | 49,948 | 36,541 | 13,407 |

* Sales are in the thousands of dollars.

The following tables respectively cover the dollar volume of direct sales to the government by Applied Dynamics, Comcor,

and Systron-Donner over the relevant accounting years.

### APPLIED DYNAMICS

Sales * to the Government

| YEAR | TOTAL | ANAL. | OTHERS |
|------|-------|-------|--------|
| 1965 | 1,563 | 1,288 | 275 |
| 1966 | 1,467 | 1,102 | 365 |
| 1967 | 479 | 458 | 21 |
| Total | 3,509 | 2,848 | 661 |

* Sales are in the thousands of dollars.

### COMCOR

Sales * to the Government

| YEAR | TOTAL | ANAL. | OTHERS |
|------|-------|-------|--------|
| 1964 | 208 | 208 | 0 |
| 1965 | 592 | 592 | 0 |
| 1966 | 700 | 600 | 100 |
| 1967 | 5,672 | 4,030 | 1,642 |
| 1968 | 411 | 411 | 0 |
| 1969 | 1,190 | 1,190 | 0 |
| 1970 | 390 | 274 | 116 |
| 1973 | 14 | 0 | 14 |
| 1976 | 323 | 323 | 0 |
| Total | 9,500 | 7,628 | 1,872 |

* Sales are in the thousands of dollars.

### SYSTRON–DONNER

Sales * to the Government

| YEAR | TOTAL | ANAL. | OTHERS |
|------|-------|-------|--------|
| 1964 | 38 | 38 | 0 |
| 1965 | 220 | 204 | 16 |
| 1966 | 190 | 178 | 12 |
| 1967 | 316 | 312 | 4 |
| 1968 | 89 | 89 | 0 |
| 1969 | 80 | 80 | 0 |
| 1971 | 35 | 35 | 0 |
| 1972 | 69 | 69 | 0 |
| 1974 | 26 | 26 | 0 |
| Total | 1,063 | 1,031 | 32 |

* Sales are in the thousands of dollars.

**15.** These Category II sales were made by EAI,

### *Sales to Government Contractors*

The next category covers sales [15] of analog computers, and "OTHERS" to government contractors under ASPR § 9–102.2, 32 C.F.R. § 9.102–2 (Standard Sheet From Authorization and Consent Clause). This clause provides:

> The Government hereby gives its authorization and consent for all use and manufacture of any invention described in and covered by a patent of the United States in the performance of this contract or any part hereof or any amendment hereto or any subcontract hereunder (including any lower-tier subcontract).

Defendant initially contends that the omission of the "use for" phrase in the savings clause of the December 29, 1972, settlement agreement resulted in purchasers of computers from EAI being released from liability for any use made of the computers. For reasons explained more fully hereinabove, the savings clause has been reformed to include the "use for" phrase and defendant's contention is rejected.

Defendant also points out that since the sales involved in this category were to commercial customers of EAI, Comcor and Systron-Donner, there is no way of knowing if the computers were used for the defendant, for other commercial customers of the purchaser, or for both. As stated in *Price v. United States*, 202 USPQ 213 (Ct.Cl.1979), a plaintiff in this court has the burden of proving that equipment is used by or for the government, and the failure to show this would fatally flaw plaintiff's 28 U.S.C. § 1498 claim. Similarly, in this instance, the failure of plaintiff to show that the computers were used by the purchasers to perform services only for the United States dictates that those EAI sales cannot be included in this accounting.

Comcor and Systron-Donner.

■ Plaintiff's Category III figures are similar to the above, but involve sales of computers[16] to customers who performed at least one contract[17] for the government under ASPR 9–102.1, the "long form" of the authorization and consent clause. As defendant points out, these contracts are not in evidence and there has been no showing that the contract required the customer to use an analog computer which infringed the patent in suit. *See Carrier Corp. v. United States,* 208 Ct.Cl. 678, 683, 534 F.2d 244, 247 (1976). Thus these sales cannot be included in the accounting.

Plaintiff's Category IV[18] figures are similar to the previously discussed Categories II and III figures, but cover sales of computers, etc., which plaintiff characterizes as being "admittedly made under government contracts." Plaintiff admits that it has not produced any contract to evidence these sales, but in mitigation explains that it unsuccessfully sought to find them.

■ Plaintiff complains, with regard to Categories II, III and IV-type sales, that defendant has failed to preserve these documents notwithstanding that it was aware of the ongoing litigation and the necessity of such documents to plaintiff to prove its damages. Plaintiff thus argues that defendant should bear the brunt of the loss of documents and urges the court to presume that its figures[19] are correct. In commenting in a slightly different setting about the destruction of government documents, the Court of Claims stated in *Calhoun v. United States,* 197 Ct.Cl. at 50, 453 F.2d 1385:

[T]he record does not suggest that the Government wilfully destroyed such records as it had in order to avoid liability here; on the contrary, they appear to have been disposed of in ordinary course under the normal records-disposal program.. Also, the 0-ring is the type of minor, fungible item, most often a part of a more complex structure, for which the Government cannot be expected to keep and preserve as detailed records as for larger or more unique equipment. *Cf. Coakwell v. United States,* 178 Ct.Cl. 654, 660, 372 F.2d 508, 512 (1967). In these circumstances—the decisions tend to suggest—the infringing defendant is not as disfavored as where he deliberately throws out helpful records or negligently loses them. *Cf. Gotham Silk Hosiery Co. v. Artcraft Silk Hos. Mills* [147 F.2d 209 (3 Cir.1944)] *supra.*

So, too, in this instance there has been no showing that the government deliberately destroyed its documents to avoid liability and thus defendant should not be blamed for their absence.

Category V figures involve sales[20] of analog computers and peripheral equipment to customers who claimed a Department of Defense priority rating or were subject to the Renegotiation Act. The plaintiff states that the EAI documents[21] bear a Department of Defense priority rating that clearly discloses the government's liability.

The fact that EAI has earmarked the proceeds of such sales as being subject to the Renegotiation Act does ensure the accuracy of plaintiff's contentions. However, that unfortunately does not dispose of the

---

**16.** These sales were allegedly made by both EAI and Systron-Donner.

**17.** While the parties stipulated that at least one contract was performed for the government, it has not been identified and it is therefore impossible to include any dollar volume of purchases for this category.

**18.** These Category IV sales were allegedly made by EAI, Comcor and Systron-Donner.

**19.** The actual source of the figures in plaintiff's Frost and Sullivan report is unknown.

**20.** The Category V sales were made by both EAI and Systron-Donner.

**21.** Plaintiff says nothing about the Systron-Donner documents.

matter, for even though a sale is made to the government does not mean that the government has authorized or consented to the contractor's use of a computer that infringes plaintiff's patent. It is possible that the contract could have been fulfilled by a noninfringing system. Since plaintiff has failed to show that these contracts contained appropriate authorization and consent clauses, these sales cannot be included in the compensatory base. *See Carrier Corp. v. United States,* 208 Ct.Cl. at 683, 534 F.2d 244.

■ The Category VII [22] sales are stipulated as being accurate and infringing. The only objection raised by defendant is that the sales are for a hybrid system and that only the analog portion should be included in this accounting. For reasons previously explained, the digital section of the hybrid system is also to be included in the compensation base. Accordingly, the following sales are made part of this accounting:

CATEGORY VII

| Year | Agency | Equipment | Anal. | Others | Total |
|------|--------|-----------|-------|--------|-------|
| 1965 | NASA | Hybrid | | | 1,243 |
| 1968 | NASA | Hybrid | | | 250 |
| | | | | | ———— |
| | | | | | 1,493 |

■ The Category VIII sales relate to the sale of the EAI 231R to certain government contractors. Interrogatories were sent to the contractors identified in this table to determine if the EAI 231R computers purchased by the companies were used in the performance of a government prime or subprime contract. The entries in Category VIII could not be identified by the companies as having been involved in government work. The plaintiff then sought the information from Mr. Skolnick, who identified the Category VIII sales as being compensable. Plaintiff points out that Mr. Skolnick had no motive to exaggerate the potential liability of his employer.[23] The court agrees, and thus these sales are included in the accounting:

CATEGORY VIII

Skolnik Identified Sales *
Subject to Liability

| YEAR | ENTRY NO. | EQUIP. | CUSTOMER | EXP. ANAL. | EXP. W/O. ANAL. | OTHERS | TOTAL |
|------|-----------|--------|----------|-----------|----------------|--------|-------|
| 1962 | 539 ** | 231 | NAA | 592 | | 87 | 679 |
| | SS-9 | 231R | RYAN | 67 | | | 67 |
| 1963 | 578 | 231R | NAA | 1,242 | | 192 | 1,434 |
| 1964 | 596 | 231R | BENDIX | 55 | | | 55 |
| | | | | | | | 2,235 |

\* Sales are in the thousands of dollars.

\*\* The contract register also states this sale is under a prime government contract.

---

Category IX lists the dollar volume of business which EAI did at its Computation Center for either government agencies or government contractors. The source of this information is EAI's own renegotiation reports, and as previously noted, this along with the fact that EAI is an indemnifier of provisions, have to reimburse the defendant for its liability to plaintiff.

**22.** There are no Category VI sales.

**23.** EAI is a third-party defendant in this action and may, under appropriate indemnification

defendant ensures the accuracy of the figures.

█ Defendant also objects to the use of these figures because they include charges for other than the actual computer time needed to solve the customers' problems. Plaintiff does not deny that additional charges, besides mere computer time, may be reflected in the figure, but it points out that the computer solution received by the customers verified all of this work as well. Thus it urges that the use of these figures is justified.

The court agrees. It would be difficult to exclude from the costs charged by the Computation Center the time spent by engineers in areas indirectly related to the computer solution. Accordingly, all of the figures will be included in the compensatory base, except for the years 1959 and 1960, which relate to services performed before the January 10, 1961, issue date of the patent.

CATEGORY IX—REVISED

EAI Computation Center Sales * to
Government Agencies and Government Contractors

| FYE | Source of Data | Renegotiable Service Sales Amount |
|-----|----------------|------------------------------------|
| 1961 | Consol. Reneg. Report | 216 |
| 1962 | Uncons. Reneg. Report | 578 ** |
| 1963 | Consol. Reneg. Report | 314 |
| 1964 | - same - | 637 |
| 1965 | - same - | 586 |
| 1966 | - same - | 1,323 |
| 1967 | - same - | 465 |
| 1968 | - same - | 754 |
| 1969 | - same - | 391 |
| 1970 | Report lumps maintenance and service; approx. $3,264,000; Bradley estimate | 57 |
| 1971 | Report lumps maintenance and service; approx. $2,150,000; Bradley estimate | 0 |
| 1972 | Report lumps maintenance and service; approx. $2,199,000; Bradley estimate | 0 |
| Total | | $ 5,621 |

* Sales are in the thousands of dollars.

** The renegotiation report lists $280,000 but does not include the Los Angeles Computaton Center renegotiable sales; the latter are reported in plaintiff's Ex. 200 at 00109 as $298,000.

█ The Category X figures relate to what plaintiff characterizes as compensable parts sales. As previously indicated, parts which are merely purchased to repair a patented system are not compensable. As stated in *Calhoun* and *Leesona,* the purchaser of a patented combination has the right to repair and to continue to use the combination without further payment of a royalty. Thus, Category X figures shall not be included in the compensatory base.

█ Category XI figures relate to sales of infringing computer systems to a variety of universities. Plaintiff urges, since a

number of the universities involved were doing considerable amounts of research and development work on weapons and aerospace technology that required the use of hybrid and analog computers, that the cost of those computers should be included in the compensatory base. The court does not agree. Plaintiff has failed to provide any contracts or other probative evidence to support its speculation. Therefore, those figures will not be included in the accounting.

■ Category XII figures involve purchase of computer systems by contractors who are known to perform government research and development activities. Plaintiff urges that the type of government research and development that they usually performed calls for the use of an analog computer. However, as defendant points out, when queried about those transactions the contractors denied government involvement in the purchase or use of the computers. In addition, there has been no showing that the computers involved in this category were only used to perform work for the government. Under the circumstances, these figures cannot be included in the accounting.

■ Category XIII figures relate to sales of computers to a variety of purchasers. The part of the category entitled "Additional Sales" covers sales of EAI systems. The defendant refused to stipulate this subcategory because it could not be certain that the sale was made or the computers sold infringed the patent in suit, or because the identity of the purchaser was unknown. The court agrees, and thus this subcategory will not be included in the accounting.

■ The subcategory of XIII entitled "Adjudicated Infringing Equipment— Government" covers sales of infringing computers [24] directly to a government agency. These figures also include hybrid computers which have previously been

found to be part of the infringing combination. This subcategory of systems will be included in the accounting.

### CATEGORY XIII

Adjudicated Infringing Equipment

Government

Summary by Years

| Year | Total [*] |
|------|-----------|
| 1964 | 0 |
| 1965 | 92 |
| 1966 | 0 |
| 1967 | 0 |
| 1968 | 250 |
| 1969 | 223 |
| 1970 | 22 |
| 1971 | 0 |
| 1972 | 122 |
| | 709 |

[*] Figures are in thousands of dollars.

■ The next subcategory, XIII sales, is entitled "Adjudicated Infringing Equipment-Unknown and Non-Government Purchasers." The facts surrounding these figures are for the most part based on speculation. Plaintiff has introduced no probative evidence to support these sales. They therefore cannot be included in the accounting.

■ The subcategory XIII figures entitled "640/8400 Sales—Government" relate to sales of the 640 and 8400 digital computer to the government. The plaintiff states that they were used as part of a hybrid system and that this view is supported by the evidence from EAI's own file. Plaintiff's proofs are found wanting. There has been no showing that these digital computers were ever used in conjunction with a previously purchased EAI analog computer to form a hybrid system. These figures will not be included in the accounting.

**24.** It also includes expandables, but since these devices have not been found to infringe the claims, these sales are not included.

The subcategory XIII figures entitled "640/8400 Sales—Unknown and Non-Government Purchases" are rejected for the same reasons as the previous Subcategory.

 The Category XIV figures relate to sales of AD–4 systems to government agencies and known R & D contractors. As was explained hereinbefore, the AD–4 system infringes claims 7, 8 and 13 of the patent in suit. As to the nongovernment purchasers, there is no probative evidence of record to show that these purchasers did indeed use the AD–4 to perform work for the government. Plaintiff merely speculates that this is so. Moreover, there is no showing that the AD–4 was not used by these purchasers to perform nongovernment work. Sales to R & D contractors are thus rejected. However, the subcategory also includes a number of sales of AD–4 systems to government agencies. These sales are listed below by year and are included in this accounting.

TABLE 29

CATEGORY XIV

AD–4 Sales * by Year to Government Agencies

| Year | Total |
| --- | --- |
| 1967 | 725 |
| 1968 | 607 |
| 1969 | 776 |
| 1970 | 626 |
| | 2,734 |

* Sales are in the thousands of dollars.

Combining each of the above categories that have been found to include infringing procurement for each of the years relevant to this proceeding results in the following totals:

| Year | Total* |
| --- | --- |
| 1958 | $ 1,070 |
| 1959 | 3,299 |
| 1960 | 2,113 |
| 1961 | 3,810 |
| 1962 | 3,939 |
| 1963 | 5,062 |
| 1964 | 8,083 |
| 1965 | 7,096 |
| 1966 | 9,071 |
| 1967 | 11,220 |
| 1968 | 4,958 |
| 1969 | 7,977 |
| 1970 | 3,369 |
| 1971 | 1,992 |
| 1972 | 3,090 |
| 1973 | 14 |
| 1974 | 26 |
| 1975 | — |
| 1976 | 323 |
| | $76,512 |

* Figures are in thousands of dollars.

### Delay Damages

Delay damages have been included in all 28 U.S.C. § 1498 proceedings in order to compensate the patentee for the loss of monies that should have been paid on an annual basis, but were not. It is an attempt by the courts to repay the patentee for the loss of money to which it had a right.

The parties agree that for the years 1961 through 1975 the rate of delay damages has been fixed by *Pitcairn* at 4¾% for the years 1961–65, at the rate of 6½% for the period 1966–70, and at the rate of 7½% for the period 1971–75.

The parties are typically at odds over the rates to be used for the remaining years. Defendant recommends that the court set the rate at 8% per annum for each of the remaining years. But plaintiff correctly points out that such a rate ignores the recent pronouncement on this issue in *Bendix Corp. v. United States*, 230 Ct.Cl. 247, 265, 676 F.2d 606, 616 (1982), in which the court recognized the fairness of more realistic, higher rates. The court based its rates on 26 U.S.C. § 6621, which sets the rate to be paid to taxpayers for overpayments. Although urging higher rates based on a variety of reasons, plaintiff

submits that "it is entitled to at least 9.6% for the 1976–1980 quinquennium, to at least 12% for 1981, and to at least 20% for the period beginning February 1, 1982 until payment of judgment."

■ After carefully reviewing current CAFC cases on the subject of prejudgment interest, and the Supreme Court's recent decision in *General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 103 S.Ct. 2058, 76 L.Ed.2d 211 (1983), this court concludes that delay interest rates should be set to adequately compensate the patentee for the lost use of its money during the relevant accounting period. This position is reflected in *Lam, Inc. v. Johns-Manville Corp.*, 718 F.2d 1056, 1066 (Fed.Cir.1983), which approved the use of prime rates.

Section 6621 sets interest at the prime rate, and its use has been approved by our predecessor court. *See Bendix Corp. v. United States*, 230 Ct.Cl. at 265, 676 F.2d 606. The rates set under § 6621 will be applied for the post-*Pitcairn* period of 1976 to date.

In sum, the following interest rates are used for the calculation of delay damages [25]:

(a) Up to and including 1965 ....... 4.75%
(b) January 1, 1966 through December 31, 1970 .................. 6.50%
(c) January 1, 1971 through December 31, 1971 .................. 7.50%
(d) January 1, 1976 through December 31, 1978 .................. 7.00%
(e) January 1, 1978 through December 31, 1979 .................. 6.00%
(f) January 1, 1980 through December 31, 1981 .................. 12.00%
(g) January 1, 1982 through December 31, 1982 .................. 20.00%
(h) January 1, 1983 through June 30, 1983 ...................... 16.00%
(i) July 1, 1983 through present [26] . 11.00%

Plaintiff also urges the court, pursuant to *United States v. 319.46 Acres of Land More or Less*, 508 F.Supp. 288 (W.D.Okl. 1981), to pay compound interest instead of simple interest. In concluding that compound interest was necessary to provide just compensation, the Oklahoma court stated:

The economic reality is simply that if the full value of just compensation had been deposited with the Court contemporaneously with the filing of the declaration of taking, the landowner would have been able to earn compound interest. Thus, prohibiting the landowner from recovering compound interest on the deficiency acts to retroactively reduce the value of just compensation at the time of the taking by under-valuing its present worth. Accordingly, it is the conclusion of the Court that interest paid on the deficiency is to be compound interest instead of simple interest.

*Id.* at 291.

It should be noted that in *Railroad Dynamics* the CAFC compounded the prejudgment interest in awarding damages. *See* 727 F.2d at 1510 n. 1. This practice conforms with that of the Internal Revenue Service in computing interest under § 6621. *See* 26 U.S.C. § 6622 (requirement to compound interest).

■ However, plaintiff has lost sight of the purpose for allowing interest in the Claims Court. As explained in *Waite v. United States*, 222 U.S. 508, 51 S.Ct. 227, 75 L.Ed. 494, which relied on nonpatent eminent domain cases to justify the award of interest under § 1498, the statutory standard of "reasonable and entire compensation" is the equivalent of the fifth amendment's "just compensation." In pat-

---

**25.** For convenience of calculation, in parts (d) through (g), the court has computed interest beginning on January 1 of each year, rather than following the Internal Revenue Service's practice for these periods of beginning the computational period on February 1. For the same reason, the court has chosen to end each interest period on December 31 rather than January 31.

**26.** Revenue Rul. 83–171, 1983–47 I.R.B. 7 extended the interest rate of 11 percent through June 30, 1984, and Rev. Rul. 84–66, 1984–18 I.R.B. 6 extended this rate through December 31, 1984.

ent accounting cases in the Claims Court and, as well, in our predecessor court, interest was not awarded as such, but rather was always considered to be part of the just compensation to which a patentee was entitled under § 1498. Traditionally, it has always been limited to simple interest. *See Calhoun v. United States,* 197 Ct.Cl. at 59, 453 F.2d 1385. In *Calhoun,* the court stated: "The commissioner fixed January 1, 1953 as the midpoint of the accounting period, from which *simple interest (as part of just compensation)* is to accrue."

*Id.* (Emphasis supplied.) Simple interest was also used in the Court of Claims's last accounting decision of *Bendix Corp. v. United States,* 230 Ct.Cl. 247, 676 F.2d 606. It is thus concluded that as part of plaintiff's just compensation, simple interest will be used in calculating delay compensation.

On the basis of the above conclusions, the court makes the following calculations of plaintiff's reasonable and entire compensation:

REASONABLE ROYALTY and DELAY DAMAGES

| Year | Total Procurement Per Year | 6% Royalty Due at Close of Year | Cumulative Royalty Due at Close of Year (Based on 6% Per Annum Royalty Rate) | Interest for Year on Accumulated Royalty Due at Start of Year |
|---|---|---|---|---|
| 1958 | $ 1,070,000 | $ 0 | $ 0 | $ 0 |
| 1959 | 3,299,000 | 0 | 0 | 0 |
| 1960 | 2,113,000 | 0 | 0 | 0 |
| 1961 | 3,810,000 | 617,520 | 617,520 | 0 |
| 1962 | 3,939,000 | 236,340 | 853,860 | 29,332 |
| 1963 | 5,062,000 | 303,720 | 1,157,580 | 40,558 |
| 1964 | 8,083,000 | 484,980 | 1,642,560 | 54,985 |
| 1965 | 7,096,000 | 425,760 | 2,068,320 | 78,022 |
| 1966 | 9,071,000 | 544,260 | 2,612,580 | 134,441 |
| 1967 | 11,220,000 | 673,200 | 3,285,780 | 169,818 |
| 1968 | 4,958,000 | 297,480 | 3,583,260 | 213,576 |
| 1969 | 7,977,000 | 478,620 | 4,061,880 | 232,912 |
| 1970 | 3,369,000 | 202,140 | 4,264,020 | 264,022 |
| 1971 | 1,992,000 | 119,520 | 4,383,540 | 319,802 |
| 1972 | 3,090,000 | 185,400 | 4,568,940 | 328,766 |
| 1973 | 14,000 | 840 | 4,569,780 | 342,671 |
| 1974 | 26,000 | 1,560 | 4,571,340 | 342,734 |
| 1975 | 0 | 0 | 4,571,340 | 342,851 |
| 1976 | 323,000 | 19,380 | 4,590,720 | 319,994 |
| 1977 | 0 | 0 | 0 | 321,350 |
| 1978 | 0 | 0 | 0 | 275,443 |
| 1979 | 0 | 0 | 0 | 275,443 |
| 1980 | 0 | 0 | 0 | 550,886 |
| 1981 | 0 | 0 | 0 | 550,886 |
| 1982 | 0 | 0 | 0 | 918,144 |
| 1983 Jan. 1 – June 30 | 0 | 0 | 0 | 367,258 |
| 1983 July 1 – Dec. 31 | 0 | 0 | 0 | 252,490 |
| 1984 Jan. 1 – May 31 | 0 | 0 | 0 | 212,091 |
| Total | $76,512,000 | $ 4,590,720 | $ 4,590,720 | $ 6,938,475 |

Total Royalties Due ........................................ $ 4,590,720

Delay damages up to and including May 31, 1984 ........ $ 6,938,475

Delay damages—June 1, 1984, and thereafter ........... $1,403 per day

**620**

*Conclusion*

 In accordance with the above analysis, the court concludes that plaintiff is entitled to a total payment, as reasonable royalty plus delay damages, to and including May 31, 1984, of eleven million, five hundred and twenty-nine thousand, one hundred and ninety-five dollars ($11,529,-195).[27] From June 1 to and including the date of payment of this judgment, plaintiff is entitled to additional delay damages of $1,403 per day. Judgment for plaintiff is entered accordingly.

---

27. Plaintiff has asked for an award of attorneys' fees and expenses pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(d). That request is premature and IS DENIED WITHOUT PREJUDICE to plaintiff's right to resubmit its request "within 30 days * * * after the entry by the court of a final judgment," in accordance with the provisions of RUSCC 81(e).